RONALD HOOVER *et al.*, Plaintiffs-Appellees, *v.* THE MAY DEPARTMENT STORES COMPANY, Defendant-Appellant.

Fifth District    Nos. 77-153, 77-189 cons.

Opinion filed July 5, 1978.

WINELAND, J., dissenting.

Robert S. Allen and Frank P. Wolff, Jr., both of Lewis, Rice, Tucker, Allen & Chubb, of St. Louis, Missouri, Norman J. Gundlach, of Gundlach, Lee, Eggman, Boyle & Roessler, of Belleville, and Newton N. Minow and Kirk B. Johnson, both of Sidley & Austin, of Chicago, for appellant.

Richard Shaikewitz, of Wiseman, Shaikewitz, McGivern & Wahl, of Alton, and Neil Bernstein, of Clayton, Missouri, for appellees.

Mr. JUSTICE JONES delivered the opinion of the court:

This is an appeal by defendant May Department Stores Company from a judgment of the circuit court of Madison County in favor of plaintiffs Ronald Hoover and Sheila Ruth, individually, and as representatives of a class composed of defendant's charge account customers.

The judgment appealed from is a summary judgment with detailed findings entered on March 2, 1977, pursuant to the parties' separate motions for summary judgment and May's motion to dismiss the action as a class action. Since portions of the order were necessarily interlocutory in nature, the court, on the motion of defendant, entered a modification order March 25, 1977, pursuant to Supreme Court Rule 308 (Ill. Rev. Stat. 1975, ch. 110A, par. 308) covering all of the findings and directives of the judgment. We granted the defendant's application for an interlocutory appeal and therefore have all aspects of the case before us for review.

One of the divisions of defendant May Department Stores Company is the Famous-Barr Company. Famous-Barr Company is a concern which sells a broad range of merchandise for cash or credit through 12 outlets or

stores in the St. Louis metropolitan area. The St. Louis metropolitan area encompasses cities and towns in both Illinois and Missouri. One of the Famous-Barr stores is located in Illinois, the remainder are in Missouri. This case involves Famous-Barr's policy with respect to issuance of "Eagle Stamps" to the customers of its stores. Eagle Stamps are trading stamps which defendant issues as a sales promotion program. The facts are not in dispute, only the legal effect to be ascribed to them.

Famous-Barr has issued Eagle Stamps in connection with sales of merchandise at its stores since the early 1900's. Its policy as to which of its customers are entitled to receive the stamps apparently has been unchanged since the inception of the stamp program.

Under this policy only cash customers and charge account customers who pay their entire balance before the next billing date after receiving a statement are entitled to receive Eagle Stamps. The charge account customer who decides to pay for his purchases in one or more deferred payments cannot obtain stamps, either after a partial payment or upon complete payment of all balances due. Moreover, if a charge account customer, upon the first appearance on his monthly statement of an amount for new purchases, immediately remits payment in that amount, he is still not entitled to any stamps if he has a balance carried over from previous billing cycles since Famous-Barr's policy is to apply all payments towards the oldest balances first.

The procedures for obtaining the stamps are as follows. When a customer purchases an item in a Famous-Barr store by cash or check he receives a receipt. He may then take the receipt of the Eagle Stamp counter in that store or any other Famous-Barr store and exchange it for stamps. A charge account customer who pays his entire balance by mail before his next billing date receives a receipt with his next monthly statement that can be exchanged for stamps at any Eagle Stamp counter in any Famous-Barr store. If he pays his entire bill during this period in person he is issued stamps at that time. One stamp is issued for every 10¢ of qualified purchases. The stamps are then pasted into books and either redeemed for cash at an Eagle Stamp counter or redeemed for merchandise certificates which are honored by any Famous-Barr store.

During most of the time relevant to this suit, an Eagle Stamp book held 1,250 stamps. Famous-Barr's policy was to accept only full books of stamps at its stamp counters. However, the Eagle Stamp Company, another division of defendant May Company, redeems partial books and loose stamps as a customer convenience if unusual circumstances exist. Each full book was exchangeable for $2.25 in cash, or, upon election by the customer, $2.50 in merchandise certificates.

Sometime in 1976, the Eagle Stamp Company began supplying stamp books that hold 1,500 stamps. Since these books are redeemable for $2.70

cash or $3 in merchandise certificates, the relative cash value of the stamp has remained constant at 18¢ per each $10 of purchases, in other words, 1.8% of the purchase price.

Both of the named plaintiffs are Illinois residents who have charge accounts with Famous-Barr and have shopped at stores in both Missouri and Illinois, purchasing items in both States pursuant to their charge agreements. The complaint upon which the instant summary judgment order was entered is a class action brought on behalf of these plaintiffs and all other persons, whether Illinois residents or not, who have purchased goods from Famous-Barr stores pursuant to charge agreements and have paid for the goods in more than one installment.

The complaint alleged that the above stated policy of denying stamps to charge customers who pay their statements in installments violates the Retail Installment Sales Act (Ill. Rev. Stat. 1975, ch. 121½, pars. 501-533) in that the forfeiture of this 1.8% or 2% "Eagle Stamp discount" is a component of the "finance charge" which under the Act should have been, but was not, disclosed in the charge account agreement and monthly statements and the inclusion of which caused the finance charge actually assessed to be in excess of that allowable under the Act.

Count two of the complaint contained similar allegations with respect to the Missouri Retail Credit Sales Act (Mo. Rev. Stat. §§408.250—408.370 (1975 Supp.)). The count charges that the denied Eagle Stamp discount results in an increase in the "time charge" paid beyond that allowable by law and that the "time charge" was not properly disclosed under the Missouri Act because the discount's value was not included in the agreement or statements.

The two remaining counts of the complaint allege violations, of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1975, ch. 121½, par. 261 *et seq.*) and the Missouri Merchandising Practices Act (Mo. Rev. Stat. §407.010 *et seq.* (1975 Supp.)) based on misleading statements and deliberate concealments of defendant's Eagle Stamp policy.

In its judgment the trial court held the loss of the Eagle Stamp discount to be a "finance charge" within the meaning of the Illinois Retail Installment Sales Act and to be a part of the "time charge" under the Missouri Retail Credit Sales Act. The court further found the defendant's failure to disclose this portion of the charges to be respective violations of section 25 and 408.290 of the Illinois and Missouri Acts (Ill. Rev. Stat. 1975, ch. 121½, par. 525, and Mo. Rev. Stat. §408.290 (1975 Supp.)), and that the resultant charges were in excess of those allowable under section 28 of the Illinois Act (Ill. Rev. Stat. 1975, ch. 121½, par. 528) and section 408.300.2 of the Missouri Act (Mo. Rev. Stat. §408.300.2 (1975 Supp.)).

On the two fraud counts, the court held that defendant's disclosures

were misleading as a matter of law but found that the ordering of further relief was unnecessary since even a full disclosure of the unlawful practices would not have been a defense to defendant's violations of the Illinois Retail Installment Sales Act and the Missouri Retail Credit Sales Act. See Ill. Rev. Stat. 1975, ch. 121½, par. 513, and Mo. Rev. Stat. §408.350 (1975 Supp.).

In addition, the court in the judgment: (1) adjudged the action to be a proper class action; (2) permanently enjoined the defendant from pursuing the policy of nonissuance of stamps described above; (3) declared defendant a constructive trustee of all excessive finance charges collected since November 5, 1968, and ordered it to make restitution of such; (4) ordered the defendant to make a complete accounting of the names and last known addresses of every class member and the amount due to each, including interest; (5) ordered the defendant to set aside a fund of $9,000,000 from which to satisfy the terms of the decree; (6) directed defendant to provide notice to all class members so as to advise them of the terms of the decree and their right to "elect out" of the class by mailing an appropriate notice to the court; and (7) provided for the award of reasonable attorneys' fees and costs to plaintiffs' attorneys to be paid out of the fund to be created by defendant.

There are three main issues in this appeal: (1) was this a proper class action; (2) did defendant's Eagle Stamp policy violate the Illinois and Missouri Sales Acts, resulting in the imposition of an excessive "finance charge" or "time charge" within the meaning of the respective Acts; and (3) was the relief awarded proper. In addition, the class action issue contains subissues, such as the necessity of prejudgment notice to class members and the existence or necessity of a "common fund" for class relief.

■■  We turn first to the issue of the propriety of the trial court's allowing this action to be maintained as a class action.

Our supreme court has recently noted that the class action is a potent procedural vehicle which under its terms allows claims of numerous persons to be decided without the personal appearance of each and permits the vindication of the rights of numerous persons in a single action when for many reasons individual actions would be impracticable. *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 334-35, 371 N.E.2d 634; see also *Adams v. Jewel Companies, Inc.* (1976), 63 Ill. 2d 336, 347, 348 N.E.2d 161; *Smyth v. Kaspar American State Bank* (1956), 9 Ill. 2d 27, 44, 136 N.E.2d 796.

Impracticability of individual actions or joinder is a touchstone of representative suits as is apparent from the fact that the original purpose of the invention of class actions in equity was to enable equity "to proceed to a decree in suits where the number of those interested in the subject

matter of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable." *Hansberry v. Lee* (1940), 311 U.S. 32, 41, 85 L. Ed. 22, 27, 61 S. Ct. 115, 118.

Class actions are particularly alluring in the area of consumer protection since it is often the case that the situations presented are ones where *individual* litigation of the underlying dispute is not feasible, usually because the costs of litigation greatly exceed the value of the potential relief which could be awarded.

> "To consumerists, the consumer class action is an inviting procedural device to cope with frauds causing small damages to large groups. The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in gains which are both handsome and tempting. The alternatives to the class action— private suits or governmental actions—have been so often found wanting in controlling consumer frauds that not even the ardent critics of class actions seriously contend that they are truly effective. The consumer class action, when brought by those who have no other avenue of legal redress, provides restitution to the injured, and deterrence of the wrongdoer." J. Landers, *Of Legalized Blackmail and Legalized Theft: Consumer Class Actions and the Substance—Procedure Dilemma,* 47 So. Cal. L. Rev. 842, 845 (1974).

This case points up the truth of these observations as to the impracticability of either joinder or resolution of the dispute by individual litigation.

According to defendant's responses to plaintiffs' interrogatories, Famous-Barr had, at that time, in excess of 491,000 charge account customers; hundreds of thousands of which must be class members as defined in this suit. It is obvious that these class members are too numerous for joinder and that if these individuals were to pursue individual actions, the burden placed on the courts would be staggering. Moreover, the average claim of each member is estimated to be $20, a sum which hardly motivates one to resort to the costly forum of our judicial system for individual vindication. For all these reasons, adjudication of the questions of this suit is impracticable save through the vehicle of a class action.

At the time summary judgment was entered in plaintiffs' favor in this suit, all questions concerning the propriety of class actions were decided by case law in Illinois—a common law approach. (See *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 335, 371 N.E.2d 634, 642, and authorities cited therein.) One of the requisites was the existence of a community of interest in both the subject matter and the remedy.

(*Peoples Store of Roseland v. McKibbin* (1942), 379 Ill. 148, 39 N.E.2d 995; *Smyth v. Kasper American State Bank.*) Our examination of the plethora of decisions cited to us in this case, especially those which attempt to flesh out the "community of interest" requirement by enumerating many factors to be considered in determining whether such a community of interest exists (*e.g., Moseid v. McDonough* (1968), 103 Ill. App. 2d 23, 27-28, 243 N.E.2d 394), leads us to agree with the author of a law review comment that "Illinois case law provides little guidance as to the *definitive* requirements for maintaining a class action." (Emphasis added.) Comment, *Illinois: A Common Law Approach*, 68 Nw. U.L.Rev. 1094 (1974).

A more terse and lucid statement of the "community of interest" requirement, found in the more recent case law, is as follows: "[T]he existence of common questions which dominate the controversy and pertain to each class member and an interest in a common result." *Adams v. Jewel Companies, Inc.* (1976), 63 Ill. 2d 336, 347, 348 N.E.2d 161, 167; *Magro v. Continental Toyota, Inc.* (1977), 67 Ill. 2d 157, 365 N.E.2d 328; *Ross v. City of Geneva* (1976), 43 Ill. App. 3d 976, 357 N.E.2d 829.

Another requirement for a class action, sometimes considered a separate and distinct requirement (*Landesman v. General Motors Corp.* (1976), 42 Ill. App. 3d 363, 365, 356 N.E.2d 105, 107) and sometimes as a factor to be considered in deciding whether a community of interest exists (*Brooks v. Midas-International Corp.* (1977), 47 Ill. App. 3d 266, 271, 361 N.E.2d 815, 818), is that the named party or parties adequately represent the rights of the class. Due process dictates this requirement. Since class actions by their very nature adjudicate the rights of parties not before the court, it has long been held that due process requires that the parties before the court must adequately represent the interests of those not before the court. (See *Hansberry v. Lee* (1940), 311 U.S. 32, 42-43, 85 L. Ed. 22, 27, 61 S. Ct. 115, 118-19; *State Life Insurance Co. v. Board of Education* (1946), 394 Ill. 301, 308, 68 N.E.2d 525, 529.

During the pendency of this appeal, the legislature enacted a bill (P.A. 80-809, effective Oct. 1, 1977) which added six sections to the Civil Practice Act, all dealing with class actions. Section 57.2 provides:

"Prerequisites for the Maintenance of a Class action.

(a) An action may be maintained as a class action in any court of this State and a party may sue or be sued as a representative party of the class only if the court finds:

(1) The class is so numerous that joinder of all members is impracticable.

(2) There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3) The representative parties will fairly and adequately protect the interest of the class.

(4) The class action is an appropriate method for the fair and efficient adjudication of the controversy."

Although this section primarily codifies previous case law on class actions, its simplicity undercuts the vagaries made possible by the divergent lines of cases which have developed over the years as to what goes into making a sufficient "community of interest." As stated by our supreme court: "It would be needless to consider the variations in our case law on this aspect. With the advent of the statute many of the prior decisions have become corpses." *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 338, 371 N.E.2d 634, 643.

Since this case was decided before this section became law our decision on the class action questions will be grounded on the case law requirements; however, the statute now in effect lends us guidance as to what weight should be accorded to the previous case law.

After due consideration, we find that the instant case presents a proper class action.

We have already concluded that this case presents a situation where the class is so numerous that joinder is impracticable. The very idea of joining approximately 400,000 plaintiffs in a single suit is unimaginable. Such an attempt, if made, would surely serve only to render the suit unmanageable.

Defendant vehemently contends that this was an improper class action, arguing that there are no questions of law or fact common to the class members which dominate the controversy. Defendant emphasizes the fact that a majority of the class members are Missouri residents and that the class sought relief on the basis of the statutes of Missouri as well as Illinois.

There is no dispute as to the accuracy of the statement of William Fischer, financial vice-president for Famous-Barr, made in his affidavit in support of defendant's motion for summary judgment, that at least 75 per cent of Famous-Barr's charge account customers are Missouri residents. However, we believe that a class action was proper here despite the fact that people other than Illinois residents are included in the class and resort must be made to Missouri law as well as to Illinois law in order to decide the case.

First, we note that Illinois courts have found class actions maintainable in situations where the class includes the residents of other States. (*E.g., Kimbrough v. Parker* (1951), 344 Ill. App. 483, 101 N.E.2d 617.) Second, we note that the class is very cohesive in that the vast majority of the class members are residents of the general St. Louis metropolitan area, either in Illinois or Missouri, who shop in defendant's stores located on both sides of the Mississippi River and are treated exactly alike with respect to

Famous-Barr's Eagle Stamp policy for charge account customers. Defendant's operation takes advantage of the geographic and demographic factors inherent in the general St. Louis area, drawing customers from both sides of the Mississippi River to its 12 locations both in Missouri and Illinois. Its uniform policy as to Eagle Stamps provides the common factual nexus and cohesive factor for the present class.

The record reveals that plaintiff Ronald Hoover of Edwardsville, Illinois, traded extensively with the St. Louis and other Missouri Famous-Barr stores, including the downtown St. Louis, Northland, and Northwest Plaza locations. He has also traded at the store in St. Clair Square, Fairview Heights, Illinois. Since the Illinois store opened approximately two years prior to the giving of his deposition, he has divided his shopping between the Illinois and Missouri stores since there are several Missouri locations which are as close either in time or distance to his home as the Illinois store is.

Plaintiff Sheila Ruth of Edwardsville has also shopped at defendant's stores in both Missouri and Illinois. According to her deposition testimony, it would be fair to say that she trades basically at the Fairview Heights, Illinois, location and the downtown and Northwest Plaza locations in Missouri.

■■ Presumably, a similar bistate purchasing pattern permeates a substantial portion of the transactions of Missouri residents. Such a situation is all but assured when judicial notice is taken of the Missouri law which requires the closure of all Missouri stores on Sunday. See Mo. Rev. Stat. §563.721 (1975 Supp.).

When the foregoing observations are considered realistically, it becomes apparent that it would be unjust and arbitrary to allow the fortuitous location of a river and a State line through defendant's area of operation and the area from which it draws its customers to dictate which customers, uniformly affected by defendant's policy, can be class members.

■■ Similarly, we find absolutely no authority to thwart a class action merely because a complete resolution of the dispute requires examination of a sister State's law as well as our own.

The question of law common to all class members is whether the challenged stamp practice violates the State laws applicable to all charge account transactions with respect to the imposition of charges incident to the extension of credit for the purchase of consumer goods.

The defendant states in its brief that relief was sought and awarded to Illinois residents for Illinois transactions under the Illinois Retail Installment Sales Act (Ill. Rev. Stat. 1975, ch. 121½, par. 501 *et seq.*) and sought and awarded to Missouri residents for Missouri transactions under the Missouri Retail Credit Sales Act (Mo. Rev. Stat. §408.250 *et seq.* (1975

Supp.)). This observation is correct as far as it goes, but overlooks the fact that the Missouri law was applied to Illinois residents as to Missouri transactions and vice versa. In order to completely adjudicate the lawfulness of defendant's practice as applied to the party plaintiffs and all other Illinois class members, the court had to examine the relevant portions of the sales acts of both Missouri and Illinois. The same laws determine the legality of the nonissuance of stamps to Missouri charge account customers for items purchased both in Illinois and Missouri. Accordingly, all class members share these common questions of law.

Starting from its misconception that Missouri class members are the only persons whose claims are based on the Missouri Retail Credit Sales Act, defendant urges that any difference between the Illinois and Missouri acts would be fatal to the class action. Defendant directs our attention to an opinion by the Attorney General of Missouri (Op.Atty.Gen. Mo. No. 271, Oct. 9, 1969) which it feels shows such a fatal difference. After examining this opinion, we find that none of the elements which would be treated differently under the Missouri act as opposed to the Federal Credit Protection Act, commonly known as the "Truth in Lending Act" (15 U.S.C. §1601 *et seq.*) are present here.

■■ Since all class members are similarly situated factually and the Eagle Stamp policy was admittedly uniformly applied to them, no material question of fact existed. That is why disposition by summary judgment was appropriate. As our foregoing discussion has made clear, all members shared a common question of law—the legality of the stamp policy as it applied to them under both Illinois and Missouri law. Whether differences may exist in the reach of the two statutes we regard as immaterial here if it is determined that identical Eagle Stamp transactions are violative of both statutes. The only question of an individual nature is the extent to which each member was damaged if the policy was unlawful. This can be determined from defendant's records. Vice-president Fischer admitted in his deposition that by reviewing each charge account record one could determine how many stamps each person would have received had he paid each balance within the first billing cycle. Under these circumstances, the common questions predominate over any individual questions. The better reasoned cases have recognized that multiple claims for damages in varying amounts which have to be separately adjudicated do not bar a class suit if the other requirements of such a suit are present. *Fiorito v. Jones* (1968), 39 Ill. 2d 531, 236 N.E.2d 698; *Gaffney v. Shell Oil Co.* (1974), 19 Ill. App. 3d 987, 989-90, 312 N.E.2d 753, and cases cited therein.

■■ Defendant also contends that the court erred in allowing the class action, arguing that no common fund exists from collected finance or time charges from which a judgment could be satisfied and that the creation of

a fund from defendant's general assets is not proper under Illinois law (*Reardon v. Ford Motor Co.* (1972), 7 Ill. App. 3d 338, 344-45, 287 N.E.2d 519).

■■ We disagree. We concur in the reasoning and analysis of the case law concerning the common fund concept found in *Perlman v. First National Bank* (1973), 15 Ill. App. 3d 784, 798, 305 N.E.2d 236, 247, *appeal dismissed* (1975), 60 Ill. 2d 529, 331 N.E.2d 65. The court there found that there was no precedential basis for a conclusion that the term "fund" as used in class actions means a sequestered sum of money, easily identified and computed, and reasoned that there was "no basis in law or logic for permitting a class action against an individual who has sequestered all money wrongfully acquired but denying one against an individual who has comingled it with his other assets." (15 Ill. App. 3d 784, 800, 305 N.E.2d 236, 249. See also *Brooks v. Midas-International Corp.* (1977), 47 Ill. App. 3d 266, 361 N.E.2d 815.) When unjust enrichment is involved, "The liability or wrongdoing creates the fund, and whatever is taken wrongfully constitutes the fund." (*Perlman v. First National Bank* (1973), 15 Ill. App. 3d 784, 801, 305 N.E.2d 236, 249.) That such is the proper rule is emphasized by the fact that under the new statute, there is no requirement of a common fund. See Ill. Rev. Stat. 1977, ch. 110, par. 57.2, effective Oct. 1, 1977; *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 340, 371 N.E.2d 634.

We do not agree with defendant that no "finance charge" or "time charge" was collected from any class member because of Eagle Stamps. If plaintiffs' position is correct, defendant has indeed collected such charges when it accepted the payments made by charge account customers. If they had issued them stamps, the amount collected would have been reduced in the future when the stamps were redeemed for cash.

Defendant makes complaint that plaintiffs did not properly invoke the equity jurisdiction of the court, making much of the fact that the cause for damages is at law and dependent upon statute. We find no basis for error in such contention.

■■ It must be recognized that the Judicial Article embodied in the Illinois Constitution of 1970 has abolished the distinction between courts of law and equity so that our State's circuit courts have "original jurisdiction of all justiciable matters." (Ill. Const. 1970, art. VI, §9.) The purpose of section 9 was to create a single integrated trial court structure (Ill. Ann. Const., art. VI, §9, Constitutional Commentary, at 473 (Smith-Hurd 1971)), thereby vesting the circuit courts with jurisdiction to adjudicate all controversies. Consequently, so long as a case presents a justiciable matter, the circuit court has jurisdiction and the presence or absence of an adequate remedy at law is an irrelevant consideration in

determining its power to adjudicate the matter. *Lopin v. Cullerton* (1977), 46 Ill. App. 3d 378, 361 N.E.2d 6; *Stevens v. Protectoseal Co.* (1975), 27 Ill. App. 3d 724, 327 N.E.2d 427; see also Fins, *Re-Examination of "Jurisdiction" in Light of New Illinois Judicial Article,* 53 Ill. B.J. 8, 11-12, (1964).

Moreover, in view of the fact that if defendant's practice were illegal a complete resolution of this case would require a complicated accounting and the issuance of an injunction, we are of the opinion that the court properly treated this action as one in equity since a purely legal remedy would be inadequate. In addition, although a class action in Illinois must seek "equitable" relief, this requirement has been interpreted so as to permit class actions in which the principal relief sought was monetary. *Frank v. Teachers Insurance & Annuity Association of America* (1977), 47 Ill. App. 3d 821, 365 N.E.2d 28, *appeal allowed* (1977), 66 Ill. 2d 630; see *Perlman v. First National Bank; Kimbrough v. Parker.*

Defendant contends next that the court should not have adjudicated plaintiffs' claims for the absent "class members" without prior notice. It complains that the court's order whereby class members are notified after judgment has been entered and given an opportunity to "elect out" of the suit is unusual and operates to deny the class members an opportunity to participate in the suit.

As regards the issue of pretrial or prejudgment notice in class actions, Illinois offers the simple solution that it is not required, by due process or otherwise. As noted by the Appellate Court, First District, in *Frank v. Teachers Insurance & Annuity Association of America* (1977), 47 Ill. App. 3d 821, 828, 365 N.E.2d 28, 33, *rev'd on factual grounds* (1978), 71 Ill. 2d 583, 376 N.E.2d 1377:

> "While the Illinois courts have often discussed the need for *adequate representation of the interests of absent class members as a matter of due process,* they have generally not addressed themselves to the question of whether due process might require notice. [Citations.]" (Emphasis added.)

At the time this case was decided below the only reference to class actions in an Illinois statute or rule of procedure was contained in section 52.1 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 52.1) which provided for *discretionary* notice to absent parties of the dismissal or settlement of a class action. During appeal, the Civil Practice Act was amended by Public Act 80-809. New section 57.4 provides in pertinent part:

> "Notice in Class Actions.
>
> Upon a determination that an action may be maintained as a class action, or at any time during the conduct of the action, *the*

*court in its discretion may order such notice that it deems necessary to protect the interests of the class and the parties."* (Emphasis added.)

These provisions making notice discretionary with the court comport with the generally accepted notion that due process does not require some form of notice in *all* class actions (see 7A Wright and Miller, Federal Practice and Procedure: Civil §1786 (1972); *Frank v. Teachers Insurance & Annuity Association of America* (1977), 47 Ill. App. 3d 821, 365 N.E.2d 28, and cases cited therein; *People ex rel. Wilcox v. Equity Funding Life Insurance Co.* (1975), 61 Ill. 2d 303, 335 N.E.2d 448); however, they also imply that in some situations the best considered notions of fairness may require that notice be given. It is our task to determine if prejudgment notice was necessary in the instant litigation.

The idea that pretrial notice to all easily identifiable class members is required by due process in all class actions can probably be traced to the Supreme Court decision in *Eisen v. Carlisle & Jacquelin* (1974), 417 U.S. 156, 40 L. Ed. 2d 732, 94 S. Ct. 2140. The court in *Eisen,* however, held only that a literal application of Rule 23(c)(2) of the Federal Rules of Civil Procedure requires pretrial individual notice to all class members who can be identified and located with reasonable effort in class actions of the type described in subdivision (b)(3) of Rule 23 of the Federal Rules of Civil Procedure.

Although the court's holding was not actually based on due process grounds but rather on the express language and intent of Rule 23 (c)(2) (*People ex rel. Wilcox v. Equity Funding Life Insurance Co.* (1975), 61 Ill. 2d 303, 311, 335 N.E.2d 448, 453; *Frank v. Teachers Insurance & Annuity Association of America* (1977), 47 Ill. App. 3d 821, 365 N.E.2d 28), it has been noted that "much in the *Eisen* opinion indicates the court's approval of the notion underlying subdivision (c)(2), that due process may require at least some form of notice in certain class actions." *Frank v. Teachers Insurance & Annuity Association of America* (1977), 47 Ill. App. 3d 821, 829-30, 365 N.E.2d 28, 34.

Since *Eisen* the great majority of Federal authority has been that notice is not required in actions brought under subdivisions other than 23(b)(3), namely 23(b)(1) and (2). (See, *e.g., United States v. Alleheny-Ludlum Industries Inc.* (5th Cir. 1975), 517 F.2d 826, 878-79, *cert. denied* (1976), 425 U.S. 944, 48 L. Ed. 2d 187, 96 S. Ct. 1684; *Wetzel v. Liberty Mutual Insurance Co.* (3d Cir. 1975), 508 F.2d 239, 255-57, *cert. denied* (1975), 421 U.S. 1011, 44 L. Ed. 2d 679, 95 S. Ct. 2415; *Frost v. Weinberger* (2d Cir. 1975), 515 F.2d 57, 65; *Larionoff v. United States* (D.C. Cir. 1976), 533 F.2d 1167, 1184-86, and cases cited therein.

The rationale behind the different treatment and rules has been that some classes simply are more cohesive than others. For example, in many

instances each member will be affected as a practical matter by a judgment obtained by another member if individual actions were instituted. Similarly, it is less likely that there will be special defenses or issues relating to individual members in some classes as opposed to others. 7A Wright and Miller §1786 (1972); *Larinoff v. United States* (D.C. Cir. 1976), 533 F.2d 1167, 1186 n.44; *Frank v. Teachers Insurance & Annuity Association of America.* This means that there is less reason to be concerned about each member having an opportunity to be present. Consequently, the interest of the members of the class in receiving notice of the pendency of the suit is slight. (See generally *Mullane v. Central Hanover Bank & Trust Co.* (1950), 339 U.S. 306, 313-14, 94 L. Ed. 865, 872-73, 70 S. Ct. 652, 657; 87 Harv. L. Rev. 426, 433-41.) If the representative parties fairly and adequately protect the rights of the class, the absent members have been given the functional equivalent of a day in court.

■■ We find this cohesiveness to exist in the present class. All of the members were treated uniformly under defendant's Eagle Stamp policy. If it was unlawful as to one member's transactions, it was unlawful as to them all. That this case was decided by summary judgment only serves to emphasize the lack of individual questions relevant to a decision in this case. The named plaintiffs fairly and adequately represented the interests of the absent class members. Their interests were precisely the same and vigorously pursued to successful result. Consequently, it was not error to render a judgment without prior notice to the absent members. Moreover, even if notice had been given to the members before judgment, it is extremely unlikely that anyone would have "elected out" or intervened in this suit since the amount in controversy as to each individual was very small.

■ As already mentioned, the summary judgment order directed the defendant, at its own expense, to provide notice to all class members of the terms and provisions of the decree and of their right to elect out of the class. This notice was to be accomplished as to class members who still have active accounts with Famous-Barr by inclusion of a statement in their monthly account statement and as to the other class members by special letter to their last known addresses and the publication of an appropriate notice in the newspaper advertisements within Famous-Barr's trade area. We believe that placing this expense and burden on defendant was appropriate here since it came subsequent to the finding of liability on defendant's part and was essentially preparatory to defendant's making an accounting and restitution of excessive and illegal credit charges.

We next turn to the issue of whether defendant has violated the Illinois Retail Installment Sales Act (Ill. Rev. Stat. 1975, ch. 121½, par. 501 *et seq.*)

and the Missouri Retail Credit Sales Act (Mo. Rev. Stat. §408.250 *et seq.* (1975 Supp.)) with respect to the Eagle Stamp policy described above.

At the outset, we note that both of these Acts are credit disclosure laws. As such their purposes obviously are similar to that expressed in section 101 of the Federal "Truth in Lending Act" (15 U.S.C. §1601), that is: "* * * to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uniformed use of credit."

The facts relevant to this issue are few. Only charge account customers who pay their balances in more than one installment do not receive Eagle Stamps. There is no reference made in Famous-Barr's charge account agreement either to the Eagle Stamp program or Famous-Barr's policy with respect to issuance or nonissuance of stamps.

The monthly billing statements describe the finance charge as follows:
> "Any FINANCE CHARGE is a minimum charge of 50¢ on a balance less than $34 or was determined by applying a monthly periodic rate of 1½% (18% ANNUAL PERCENTAGE RATE) to the "Average Daily Balance" up to $500 and a monthly periodic rate of ¾% (9% ANNUAL PERCENTAGE RATE) to any excess thereof over $500."

Reference to the stamp policy is made on the front of the billing statement in the following manner:
> "* * * You may pay the entire "New Balance" at any time. If it is paid on or before the next Billing Date, there will be no FINANCE CHARGE on your next statement, and Eagle Stamps will be issued for the Eagle Stamp Amount."

The reverse side of the statement exhibits three bold-type messages as well as other information. One of the messages states:
> "Eagle Stamps are issued for the Eagle Stamp Amount when the entire new balance is paid on or before the next billing date."

The type of agreements which the class members in this suit have with defendant are "retail charge agreements" as defined both in section 2.7 of the Illinois Act (Ill. Rev. Stat. 1975, ch. 121½, par. 502.7) and section 408.250(12) of the Missouri Act (Mo. Rev. Stat. §408.250(12) (1975 Supp.)). Both of these sections deal with what is known as "open end credit accounts," that is, accounts under a single written agreement between the retailer and the customer allowing for purchases on the account from time to time and providing for the assessment of finance (or time) charges on the unpaid balance at monthly (or other regular) intervals. See *Johnson v. Sears Roebuck & Co.* (1973), 14 Ill. App. 3d 838, 853, 303 N.E.2d 627, 639.

There are basically four sections under each Act relating to retail charge agreements which must be considered in determining the legality of

defendant's Eagle Stamp policy with respect to its charge account customers.

In the Illinois Retail Installment Sales Act they are sections 2.11, 2.8, 25 and 28 (Ill. Rev. Stat. 1975, ch. 121½, pars. 502.11, 502.8, 525 and 528).

Section 2.11 (Ill. Rev. Stat. 1975, ch. 121½, par. 502.11) defines the term "finance charge." It provides in relevant part:

> " *'Finance charge' means the sum of all charges payable, directly or indirectly by the buyer and imposed directly or indirectly by the seller as an incident to or as a condition of the extension of credit,* whether payable by the buyer, the seller, or any other person on behalf of the buyer to the seller or a third party including any of the following types of charges:
>
> > (1) Interest, time price differential, and any amount payable under a discount or other system of additional charges."

(Emphasis added.)

Under the statute the principal component of the amount financed upon which such charges are assessed is the "cash sale price." Section 2.8 of the Act (Ill. Rev. Stat. 1975, ch. 121½, par. 502.8) defines cash sale price in the following manner:

> " 'Cash sale price' means the price stated in a * * * sales slip or other memorandum furnished by a retail seller to a retail buyer in connection with a retail charge agreement, for which the seller in good faith and in the regular course of business would have sold or furnished to the buyer and the buyer would have bought or obtained from the seller the goods or services which are the subject matter of a retail installment transaction, if the sale had been a sale for cash."

Section 25 of the Illinois Act sets forth the requirements for retail charge agreements, especially the disclosures which must be made. It provides in pertinent part:

> "(a) * * * *All charge agreements* executed on or after January 1, 1968 *must state the amount or rate of the finance charge to be charged and paid pursuant thereto.*
>
> (b) *The seller* under a holder of a retail charge agreement *must promptly supply the buyer* under the agreement, *as of the end of each monthly period* (which need not be a calendar month) or other regular period agreed upon by the seller and the buyer *in which there is any unpaid balance under that agreement, a statement reciting* the following terms* * *:
>
> > (1) *the unpaid balance* under the retail charge agreement at the beginning and end of the period;
> >
> > * * *

(4) *the amount of any finance charge expressed as an annual percentage rate.*" (Emphasis added.)

Section 28 (Ill. Rev. Stat. 1975, ch. 121½, par. 528) sets the maximum rates for finance charges on retail charge agreements. It provides:

"Notwithstanding the provisions of any other statute, *a retail charge agreement may provide for, and the seller or holder may, if the agreement does so provide, charge, collect and receive, a finance charge not exceeding 18¢ per $10 per month, computed on all amounts unpaid thereunder from month to month,* which need not be a calendar month." (Emphasis added.)

The four relevant provisions of the Missouri Retail Credit Sales Act are sections 408.250(17), 408.250(1), 408.290 and 408.300.2 (Mo. Rev. Stat., §§408.250(17), (1), 408.290, and 408.300.2 (1975 Supp.)).

Section 408.250(17) (Mo. Rev. Stat. §408.250(17) (1975 Supp.)) defines "time charge" as follows:

" 'Time charge' means the amount, however denominated or expressed, in excess of the cash sale price under a retail charge agreement * * * which a retail buyer contracts to pay or pays for goods or services."

Section 408.250(1) (Mo. Rev. Stat. §408.250(1) (1975 Supp.)) defines cash sale price in the following manner:

" 'Cash sale price' means the price stated in a retail time transaction for which the seller would have sold or furnished to the buyer, and the buyer would have bought or obtained from the seller, the goods or services which are the subject matter of the retail time transaction, if such sale were for cash.* * *"

Section 408.290 (Mo. Rev. Stat. §408.290 (1975 Supp.)) details the required form and contents of retail charge agreements, especially disclosures, and provides in pertinent part:

"1. * * * *All* [retail charge] *agreements executed on or after said date* [October 13, 1961] *shall state the amount or rate of the time charge to be charged and paid pursuant thereto* or shall state that a time charge not in excess of that permitted by law will be charged and paid pursuant thereto.
* * *.

2. *The retail seller under a retail charge agreement shall promptly supply the retail buyer* under such agreement *with a statement at the time of sale or as of the end of each monthly period* (which need not be a calendar month) or other regular period agreed upon by the retail seller and the retail buyer *in which there is any unpaid balance thereunder which shall recite the following:*

(1) *The total unpaid balance* under the retail charge agreement at the beginning and end of the period;

❂ ❂ ❂

(4) *The amount of time charge,* if any; ❂ ❂ ❂." (Emphasis added.)

Section 408.300.2 (Mo. Rev. Stat. §408.300.2 (1975 Supp.)) sets forth the maximum rates allowable for time charges on retail charge agreements as follows:

"2. Notwithstanding the provisions of any other law the seller and assignee under a retail charge agreement may charge, receive and collect a time charge with shall not exceed the following:

(1) On so much of the unpaid balance as does not exceed five hundred dollars, fifteen cents per ten dollars per month;

(2) If the unpaid balance exceeds five hundred dollars, seven and one-half cents per ten dollars per month on that portion over five hundred."

It can be seen from a comparison of the above quoted sections of the Illinois and Missouri Acts that they are strikingly similar in both wording and intent. In some situations, material differences as to what is or is not included in the terms "finance charge" and "time charge" may exist (*e.g.,* insurance, official fees; see Op.Atty.Gen. Mo. No. 271, October 9, 1969); however, in the instant case, the terms are functionally identical. They are both concerned with what the customer pays or is obligated to pay over and above the cash sale price in exchange for the privilege to buy on credit and pay over time.

As is apparent from the facts of this case, it is not disputed that the amount representing the value of lost stamps, 18¢ per $10, was not disclosed in the charge account agreements either as an "amount or rate" of the finance or time charge. Likewise, it is not disputed that this amount was not included in the monthly account statements in the recitation of "[t]he amount of the time charge" or "the amount of any finance charge expressed as an annual percentage rate." In addition, it is conceded that if the stamp value of 18¢ per $10 should have been included in the time charge or finance charge, the assessed charges were well in excess of those allowable under Illinois and Missouri law.

■■ The crucial question is whether that portion of the balances the class members paid which represented the value of the Eagle Stamps which they would have received and been entitled to redeem for cash, had they purchased their goods for cash, is a charge which is part of the "finance charge" or "time charge" assessed on their accounts.

Defendant notes that the Illinois and Missouri acts require respectively a "charge payable" or an amount contracted to be paid or in fact paid in order to come within their provisions. It then argues that no charge was

paid with respect to Eagle Stamps, only a benefit denied. We disagree.

After reviewing all of the facts in this case, we find that because of defendant's stamp policy the instant class of charge account customers have indeed paid a charge in excess of the cash sale price in their payments, in that the price used to calculate their payments was not and will never be reduced by future redemption of stamps corresponding to the amounts of their transactions.

Certain information in the record indicates that the trial court was reasonable and realistic in making such a comparison of the costs incurred by the customers in the class with respect to their purchases with those incurred by customers not so included. Andrew P. Brennan, chief executive officer and chairman of the board of the Eagle Stamp Company, testified in his deposition that St. Louis has been an extremely high redemption area for Eagle Stamps for many years. According to Brennan, various people in the stamp company, by looking at the issuance and redemption figures for St. Louis over a period of years, have come up with an estimated redemption rate in excess of 98%.

Defendant's view that a "charge" must always be an easily identifiable amount added to the amount paid by cash customers, similar to the disclosed 1½ and ¾% periodic monthly rates, in order to be a charge payable, directly or indirectly by the buyer and imposed directly or indirectly by the seller as an incident to or as a condition of the extension of credit and thus a "finance charge" under the Illinois Retail Installment Sales Act is simply incorrect. (See *American Buyer's Club v. Grayling*, 53 Ill. App. 3d 611, 615-16, 368 N.E.2d 1057, 1061 *appeal denied* (1978), 67 Ill. 2d 591; *Glaire v. LaLanne-Paris Health Spa, Inc.* (1974), 12 Cal 3d 915, 528 P.2d 357, 117 Cal. Rptr. 541; *Kriger v. European Health Spa, Inc.*, 363 F. Supp. 334 (E.D. Wis. 1973), all holding that the difference between what a buyer paid on a promissory note and what a seller received when assigning it, although hidden in the "cash price", was the real "finance charge" imposed; see also *Joseph v. Norman's Health Club, Inc.*, 386 F. Supp. 780 (E.D. Mo. 1974), *rev'd*, 532 F.2d 86 (8th Cir. 1976).) Hidden charges are reached by this definition as well as those clearly stated or easily ascertainable.

Defendant attempts to bolster its argument by asserting that the subject of the finance charge must be the "cash sale price" which it argues in all cases is synonymous with the price stated on the sales slip under section 2.8 of the Illinois act. Since the price so stated is the same for all customers, it feels no finance charge other than that disclosed is present.

We disagree. As noted above the Illinois statute defines cash sale price as *"the price stated * * * in a sales slip or other memorandum* furnished by a retail seller to a retail buyer in connection with a retail charge agreement, *for which the seller in good faith and in the regular course of*

*business would have sold or furnished to the buyer and the buyer would have bought or obtained from the seller the goods or services which are the subject matter of a retail installment transaction, if the sale had been a sale for cash."* (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 121½, par. 502.8.) It is true that in most cases the cash sale price will be the amount recited on the sales slip or other such memorandum. However, it is apparent from the language of the section that the term was basically meant to represent the amount which would have been paid had the sale been for cash (*Rose v. Sears, Roebuck & Co.*, 12 Ill. App. 3d 929, 299 N.E.2d 95). Where, as here, the price stated in the memorandum does not reflect the reduction in price to be taken by a cash customer as a result of the issuance of stamps to him, it is not the actual cash sale price within the intent of the legislature. In such situation, there is no price stated which represents the price for which the goods would have been sold if the sale had been for cash. The cash sale price is the price stated in such memorandum minus the value of the stamps as calculated at the time of redemption on an amount representing the stated price. The finance charge should have been determined with respect to this amount; therefore, the amount which represents the value of the stamps lost, 18¢ per $10, is a charge that is part of the finance charge. Consequently, we find that under the Illinois Retail Installment Act the finance charge was not properly disclosed and the charges actually assessed were excessive.

If anything, it is more clear that defendant's practice was improper with respect to the Missouri Retail Credit Sales Act (Mo. Rev. Stat. §408.250 *et seq.* (1975 Supp.)).

Under that act, any amount, however denominated or expressed, in excess of the cash sale price is the "time charge" which should have been disclosed and measured against the maximum charge allowable under the statute. The cash sale price is defined as *"the price stated* in a retail time transaction *for which the seller would have sold* or furnished to the buyer, *and the buyer would have bought* or obtained from the seller, *the goods* or services *which are the subject matter of the retail time transaction, if such sale were for cash."* (Emphasis added.)

Since the price stated did not account for the reduction in price afforded by the stamps, there was no price stated for which the goods would have been sold if the sale had been for cash. The actual cash sale price in this situation was the retail price stated less the value of the stamps. The time charge was therefore equal to the amount created by adding together the value of the stamps and the amount created by application of the monthly periodic rates. Consequently, the time charge assessed was clearly in excess of that allowed by section 408.300.2, and the time charge was not properly disclosed under section 408.290.

We must next address the question of whether the relief awarded in this suit was proper.

Defendant first contends that the court erred in ordering restitution to the class members in amounts representing the excessive finance charges which they paid. Defendant argues that neither act expressly provides for a private cause of action to recover illegal charges obtained and that no such right should be implied.

The Illinois Retail Installment Sales Act provides that the Attorney General or the State's Attorney of any county may bring an action against any person to restrain and prevent any violation of the Act. (Ill. Rev. Stat. 1975, ch. 121½, par. 530.) The penalties section provides further that:

"(a) Any person who knowingly violates this Act is guilty of a Class A misdemeanor.

(b) No person who violates this Act, except as a result of an accident or bona fide error of computation, may recover any finance charge, * * * in connection with the related * * * retail charge agreement." Ill. Rev. Stat. 1975, ch. 121½, par. 531.

Section 408.370 of the Missouri Retail Credit Sales Act, the penalties provision, was amended in 1975, after the filing of this suit but prior to the entering of judgment below. The section was amended by adding subsections 4 and 5, providing explicitly for a cause of action by any buyer who suffers an ascertainable loss of money or property as a result of the use or employment of any method, act or practice in violation of the Act. Mo. Rev. Stat. §§408.370.4, 408.370.5 (1975 Supp.).

The Missouri act, however, has always provided, in addition to a criminal penalty for its violation, that:

"Any person violating sections 408.260 to and including 408.330, except as the result of an accidental and bona fide error of computation, shall be barred from recovery of any time charge, delinquency or collection charge on the contract." Mo. Rev. Stat. §408.370.2 (1975 Supp.).

■■ From the foregoing, it can be seen that it is true that neither act contained an *express* private cause of action until the Missouri Retail Credit Sales Act was amended in 1975. We, however, hold that these acts, and these sections in particular, give a private cause of action in implied contract to a buyer to recover excessive finance charges collected from him.

With respect to the Illinois Retail Installment Sales Act, defendant's position seems to be that section 31(b) (Ill. Rev. Stat. 1975, ch. 121½, par. 531(b)) prohibits a retail seller from collecting or recovering any and all finance charges from its customers until it puts itself in compliance with the Act, thus allowing a buyer to refuse to pay any finance charges which

are unlawful but nevertheless denying him any right for the refund of excess finances charges actually collected by the seller.

We disagree. To interpret this section (Ill. Rev. Stat. 1975, ch. 121½, par. 531(b)) which provides that "[n]o person who violates this Act * * * may recover *any* finance charge * * *" to mean that a seller may collect any charge with absolute impunity until such time as the purchaser realizes he is being overcharged or that the seller is violating the Act and has secured a court order thwarting future finance charge payments would be both illogical and unwarranted. As stated by the court in *Garza v. Chicago Health Clubs, Inc.* (E.D. Ill. 1972), 347 F. Supp. 955, 962-63:

> "The purpose of the disclosure provisions is clearly to make borrowers more aware of the consequences of incurring debts. Where disclosure has been insufficient, the debtor has not been given as full an opportunity to evaluate these consequences as the act intended. [Defendant's] narrow interpretation would draw a distinction between those debtors who voluntarily pay their obligations and those who refuse and are sued even though all of them may have signed the same deficient contract and were thus all denied the act's protection. This would penalize those most in need of the act's protection, the debtors who do not understand their legal rights. Surely this was not the intention of the drafters of §531(b)."

The court in *Garza* held the word "recover" in section 31(b) of the Illinois Act, must be accorded its broader meaning so as to preclude voluntary collection as well as collection by legal action of finance and other charges from debtors under contracts which violate the Illinois Act's disclosure provisions, thus giving the buyer a private cause of action to recover finance charges collected by a defendant under such an illegal agreement. 347 F. Supp. 955, 963.

The courts of Illinois have recognized that it is not unusual to allow a plaintiff to found a civil cause of action on a breach of a penal statute, noting the long-established general rule that a breach of a statutory duty normally gives rise to a right of action on behalf of the injured persons for whose benefit the statute was enacted. (*Boyer v. Atchison, Topeka & Santa Fe Ry. Co.*, 38 Ill. 2d 31, 230 N.E.2d 173, *cert. denied*, 390 U.S. 949, 19 L. Ed. 2d 1140, 88 S. Ct. 1038.) Our supreme court in *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152, 155, 128 N.E.2d 691, 693, declared: "When a statute is enacted for the protection of a particular class of individuals, a violation of its terms may result in civil as well as criminal liability, even though the former remedy is not specifically mentioned therein."

In this case, the implication of a civil remedy for recovery of excessive

charges from this statute for the protection of time-buying customers is certainly less onerous and surprising to seller in view of the fact that these statutes are clearly not completely penal in nature. Both Acts contain civil penalties in their penalty provisions as well as criminal sanctions.

Defendant directs our attention to *Anco Investment Corp. v. Spencer*, 53 Ill. 2d 396, 292 N.E.2d 726, a decision of our supreme court which it feels dictates a finding that restitution on the basis of the Illinois act is not allowed. We have examined this case and do not find it controlling. The court there merely held that under the *predecessor* to the present act, a contract which does not comply with the requirements of the Retail Installment Sales Act is not totally unenforceable.

All of what we have said above with respect to the Illinois act applies with equal force to the Missouri act. It is totally unwarranted to interpret section 408.370.2 to mean that sellers in violation of the act are only barred from recovery of time charges from those debtors who have penetrated their illegal scheme of hidden charges and refused to pay any time charges. We find that a civil right to action arising from a seller's violation of the act was implied from section 408.370.2 of the act before section 408.370.4 was added providing expressly for a right of action where one had only been implied before. See *Parker v. Lowery* (Mo. 1969), 446 S.W.2d 593, 595.

Defendant makes complaint that the trial court improperly ordered an accounting, premised on its belief that such procedure is proper only when the cause of action lies in equity and that this was an action at law. Keeping in mind our comments with respect to defendant's previous argument concerning equity jurisdiction, we find no merit to this contention. Since the amount improperly collected from class members can only be achieved through review of defendant's records, an accounting is absolutely necessary to achieve justice in this case.

■■ Defendant's final contention is that the trial court erred in awarding plaintiff's attorneys fees out of the fund ordered to be created by defendant. It argues that since neither act provides for such recovery, they could not be allowed. We disagree.

The basic flaw in defendant's argument is perceived when one examines the cases cited in support of its argument that in absence of contract or a statutory provision permitting attorneys fees they are not recoverable, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 44 L. Ed. 2d 141, 95 S. Ct. 1612, and *Hamer v. Kirk*, 64 Ill. 2d 434, 356 N.E.2d 524. These cases stand for the proposition that *attorneys' fees are generally not recoverable by the successful litigant from the losing party* unless one or the other of the above factors is present. Simply stated, the award of fees from the fund here is not legally a recovery from the losing

party. That fund represents the estimated amount which defendant overcharged the class members, an amount which equitably belongs to them and is held only by defendant as a constructive trustee.

Attorneys' fees were awarded in this case pursuant to the equitable theory of recovery sometimes referred to as the "fund doctrine." This theory has been recognized in Illinois courts for some time, especially in class actions. (See, *e.g.*, *Leader v. Cullerton*, 62 Ill. 2d 483, 343 N.E.2d 897; *Flynn v. Kucharski*, 59 Ill. 2d 61, 319 N.E.2d 1.) It has recently been specifically approved in *Baier v. State Farm Insurance Co.*, 28 Ill. App. 3d 917, 329 N.E.2d 543, *aff'd*, 66 Ill. 2d 119, 361 N.E.2d 1100.

The theory has been defined as " 'the equitable concept that an attorney who renders service in creating a trust fund may in equity be allowed compensation out of the whole fund from those who directly benefit from its accumulation.' ([*State Farm Mutual Automobile Insurance Co. v.*] *Geline*, 48 Wis. 2d 290, 298, 179 N.W.2d 815, 819.)" (*Baier*, 28 Ill. App. 3d 917, 922, 329 N.E.2d 543, 548.) When attorneys fees are awarded pursuant to the theory, the fees are actually being paid by the class members or people who benefit from the fund. Each individual's award is reduced proportionately so as to allow for the payment of attorneys' fees.

The necessary elements for the entitlement to attorneys' fees under the doctrine (see *State Farm Mutual Automobile Insurance Co. v. Geline* (1970), 48 Wis. 2d 290, 300-05, 179 N.W.2d 815, 821-23) are all present in the instant case. Consequently, the award of fees was entirely proper.

For all of the foregoing reasons, the judgment of the circuit court of Madison County is affirmed. This cause is remanded to that court; all steps necessary to effect compliance with the judgment shall be made as directed by the court.

Affirmed and remanded.

EBERSPACHER, P. J., concurs.

Mr. JUSTICE WINELAND dissenting:

Because I cannot agree that this case should have been permitted to proceed as a class action, nor that the defendant violated the Illinois and Missouri retail credit statutes, nor that there is a basis in law or equity for the sweeping remedies fashioned by the trial court, I must respectfully dissent.

As this court said just three years ago, the class action is a device which requires "close and vigilant scrutiny" by the courts, and "should be resorted to only when complete justice to all interested parties will follow from its application." (*Dailey v. Sunset Hills Trust Estate*, 30 Ill. App. 3d

121, 126, 332 N.E.2d 158, 163 (5th Dist. 1975).) The majority here ignores, I think, this wise cautionary language.

Unquestionably, the class action can be an invaluable tool for redressing small injuries to numerous parties. Nevertheless, however alluring the device appears, permission to proceed with a class action should generally be refused where the right to proceed is doubtful. (*Dailey.*) The case law makes it clear that the mere fact that there are numerous aggrieved parties all of whom have similar claims against a defendant is not alone sufficient to support a class action in Illinois. See *e.g., Reardon v. Ford Motor Company,* 7 Ill. App. 3d 338, 287 N.E.2d 519, 522 (3d Dist. 1972), and cases cited therein.

The majority's opinion correctly notes that circuit courts in this state have jurisdiction over all justiciable matters. Having made that observation, it then proceeds to dismiss the defendant's contention that the trial court's equitable jurisdiction was not properly invoked. I think that the court is confusing "jurisdiction" in the sense of power and "jurisdiction" in the sense of sound principles of decision.

As Professor Chafee explained it:

"* * * [C]ourts sometimes speak of having 'jurisdiction' or not, when they are really deciding *whether they ought to exercise equitable jurisdiction.* When the word is employed in this unfortunate and confusing sense, it is wholly disconnected with the existence of power. Of course, the court possesses the power in such cases, but power alone is not enough to justify relief.

'O it is excellent to have a giant's strength; but it is tyrannous to use it like a giant.'

One of the chief troubles with the frequent preoccupation of judges with questions of power is that it makes them slide over much more important questions of wisdom and fairness which ought to receive careful attention. * * *

* * *

* * * [T]oday , with law and equity merged in a single court, 'equity jurisdiction' * * * is simply a bundle of sound principles of decision concerning particular kinds of relief. * * *

* * *

In other words, when a suit for some kind of specific relief is brought in a regular trial court * * *, then in my opinion the judge has power to decide, rightly or wrongly, whether to give the relief sought or a different kind of relief or no relief at all. * * * The appellate court may declare equity jurisdiction wanting, but this is merely equivalent to saying that he has disregarded sound principles of decision and made a wrong choice. In the witty

words of Mr. Sabel, 'Equity jurisdiction has as little to do with jurisdiction as quasi-contracts has to do with contracts.'

\* \* \*

\* \* \* This phrase [equity jurisdiction] has become an obsolete and confusing label for the great cluster of situations where the principles of right decision permit a court to sit without a jury and grant specific relief after finding that the appropriate facts have been proved." Z. Chafee, Jr., Some Problems of Equity 303-310 (1950).

It is the wisdom of the trial court's exercise of its equitable discretion with which I am primarily concerned here. I agree with the United States Court of Appeals for the Second Circuit that courts should be "reluctant to permit actions to proceed where they are not likely to benefit anyone but the lawyers who bring them." (*Eisen v. Carlisle*, 391 F.2d 555, 567 (2d Cir. 1968).) I would not be so reluctant in this case, regardless of the fact that individual class members' recoveries would be extremely small, were I convinced that we were in fact faced with some insidious illegal pricing scheme which was victimizing great numbers of the public. I do not, however, believe that this is such a case.

Since the turn of the century, Famous-Barr has had an Eagle Stamp policy virtually identical to that attacked in this case. During all the years that this retailer operated exclusively in Missouri, no Missouri court, and no Federal court, ever ruled that this policy was deceptive or fraudulent or otherwise illegal. Now, as a result of this action brought only six days after Famous-Barr's first Illinois store opened to the public, by two Illinois residents in an Illinois court, purportedly representing a class, the vast majority of whom are Missouri residents, none of whom received any notice, and after construction of novel questions of Missouri law, this policy is declared illegal, and the defendant is ordered to set aside $9 million from its general assets to repay the excessive "charges" the stamps supposedly represented, make a costly and time consuming accounting, and pay unspecified "reasonable" fees for the attorneys of the class "representatives." This to me is not a sound exercise of equitable jurisdiction.

The court purports to recognize that the Illinois statute relating to class actions enacted subsequent to this litigation does not apply to this case, but then proceeds, in my opinion, to give it undue persuasive weight. Nevertheless, I would submit that the court ignores that portion of the statute (reflective of the old case law) that a class action may be maintained only if the court finds it appropriate "for the fair and efficient adjudication of the controversy." (Ill. Rev. Stat. 1977, ch. 110, par. 57.2(a)(4).) Efficient it may be, at least so far as plaintiffs' attorneys are concerned. Fair it is not.

Returning for the moment again to the question of jurisdiction, the majority opinion brushes aside the question of jurisdiction on the ground that since this is a justiciable matter and the Constitution of 1970 vests "original and exclusive jurisdiction of all justiciable matters" in our State's circuit courts, therefore there can be no valid objection to any lack of jurisdiction. Despite this constitutional mandate it is still necessary to remember that in presenting any case calling for the exercise of equitable jurisdiction the complaint must be based on equity and good conscience. The chancellor is vested with discretion in determining whether equitable jurisdiction should be exercised in the particular case. Jurisdiction in this sense does not mean a want of power, it means a want of equity. Broadly speaking the sound discretion of the court is the controlling guide of judicial action in every phase of a suit in equity. The majority correctly recognizes this as being a suit in equity despite its designation as a suit at law. See *City of Chicago v. Fieldcrest Dairies, Inc.*, 316 U.S. 168, 86 L. Ed. 1355, 62 S. Ct. 986; *Rozema v. Quinn*, 51 Ill. App. 2d 479, 201 N.E.2d 649.

The case presented in the trial court by plaintiffs was not one that should call upon the exercise of the chancellor's favorable discretion. It is generally agreed that each class action case as in all equitable actions must be determined upon its own set of facts. *Perlman v. First National Bank*, 15 Ill. App. 3d 784, from which we quote:

"As is pointed out by the courts and the law writers and commentators, the decisions on this subject are numerous and conflicting and each case must be decided on its own merits." *Kruse v. Streamwood Utilities Corp.*, 34 Ill. App. 2d 100, 108."

The exercise of equitable jurisdiction is not automatic in class action cases. *Dvorkin v. Illinois Bell Telephone Co.*, 34 Ill. App. 3d 448, 340 N.E.2d 98; *Oppenheimer v. Cassidy*, 345 Ill. App. 212, 102 N.E. 678.

It is no secret that the rise of an undefined, and in some cases unorganized, movement, known generally as consumerism, has resulted in a vast extension of the representative suit in equity to the present rash of cases known as class action cases. We glean from a reading of these cases cited by the plaintiffs that *precedent* is helpful in determining the equitable principles which should be applied by the trial court in determining whether relief by way of class action should be granted. Yet it is primarily a matter of *sound discretion* resting in the chancellor which determines whether class action relief should in fact be granted or withheld.

This appellate court recognized the vast importance of the exercise of discretion in class action cases such as this when it said in *Dailey*, "No precise rule can be stated as to when a court of equity will exercise its jurisdiction in an accounting since the court has a large *discretion* on the

subject and may refuse to exercise its jurisdiction in cases * * * according to the circumstances of the particular case. [Citations.]" 30 Ill. App. 121, 125.

Turning now to the merits of this case, we find scant reason in equity and good conscience to grant class action relief to the plaintiffs in this case. First, we question any judicial procedure, where after the court has determined liability to exist provides that notice after the fact may be given by means of the "opt out" process to the unknown class members who supposedly have some type of heretofore unrecognized claim against the defendant. This is a far reaching extension of judicial powers and does not appear to be valid under either the present Missouri or Illinois acts.

The Illinois act as it now exists merely provides for such notice in a class action as the court may deem necessary without any further specification of the means. The Missouri act as it has now developed does not even provide for notice whereby members may "opt out" (see section 407.025.4) and specifically provides that pretrial notice be given and stipulates what it shall contain. The result is that if this suit were to be filed in the courts of Missouri where some 337,500 of the class members reside it would have failed for lack of notice under the type of notice given here.

The majority opinion recognizes the inherent difficulty in finding such notice as was afforded here, to constitute due process, and holds that since under the Federal class action provisions, prior notice has not been required then it should not be required in this instance.

As pointed out by appellant to adopt the "opt out" procedure is to create judicial chaos. To give notice after liability has been determined is to give notice after the reason for same ceases to exist. If the trial court had ruled that this was a proper class action but ruled in favor of the defendant on the merits, then the unnamed plaintiffs would have found themselves on the losing end of a decision in which they had no opportunity to participate, and in which they did not participate. The only notice they would have received—would have been the notice that they had lost the case. Upon finding that they had lost, could such class members "opt out," regroup and sue defendant again, hoping for a better result? We agree with defendant, prior class certification is prerequisite in a class action.

Notice prior to adjudication has always been a due process right. We find nothing in the law of class actions in Illinois or Missouri to change this basic constitutional right. In our opinion "opt out" notice is of grave constitutional dimensions and would of itself provide sufficient discretionary grounds upon which this court could vacate the order granting the summary judgment.

We agree with the majority in this case that both the Illinois and

Missouri Act are credit disclosure laws. "As such their purposes are obviously similar to that expressed in * * * the Federal 'Truth in Lending Act' (15 U.S.C.S. 1601), that is '* * * to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.' "

To briefly narrate the facts of this is to provide ample reason for denying the summary relief sought by plaintiffs.

We note that the suit is now reduced to where two Illinois citizens purport to represent some 337,500 (three quarters) residents of Missouri and approximately 112,500 (one quarter) residents of Illinois in a class action based on the Illinois Retail Installment Sales Act (Ill. Rev. Stat. 1973, ch. 121½, pars. 501-533) (referred to herein as the Illinois act) and the Missouri Credit Sales Act (Mo. Rev. Stat. §§408.250-403.370 (1975 Supp.)) (referred to herein as the Missouri act). Defendant's acts were also alleged to violate the Federal Truth In Lending Act (15 U.S.C. §§1601-1666J (1974)).

One of the basic questions then becomes, was the Eagle Stamp policy of the defendant such a violation of the Missouri or Illinois laws as to give rise to the drastic penalty inflicted upon the defendant by the chancellor sitting in a court of equity?

The chancellor found, and the majority approved of his finding, in determining that the failure to supply credit customers of the defendant Eagle Stamps when the customer's account is not paid within 30 days of the billing date, to constitute a "finance charge" under the Illinois act and a "time charge" under the Missouri act.

We tend to agree with defendant in this respect. We see no forfeiture or discrimination against credit customers. Nor was there any attempt to deceive them, as the trial court seemed to think, as to the failure to advise the credit customer as to terms available to him. For over a period of 60 years it seems to have been the policy of defendant company to promote its sales by giving its credit customers a choice—by paying within the 30-day period they could provide themselves a saving of an estimated 1.8% of their bill. In the event of nonpayment within the time limit the customer failed to receive the bonus. This established practice was without cost to the customer because the cost of the bonus was never added to the cost of the merchandise. This fact was not controverted. There was no change in this policy when the Missouri and Illinois acts governing credit were enacted in 1961 and in 1967, respectively. The defendant merely adopted a policy as to installment credit accounts which comported with the acts governing retail credit account, but in addition thereto, it retained its policy of providing a form of bonus to those paying within the "30 day period from date of billing."

The plaintiff refers to the continuation of this policy with reference to Eagle Stamps as "reprehensible" and "a policy that has been carefully disguised so as to mislead, confuse and cheat the public." We fail to see it as such but rather view defendants time-honored program not only as a sales promotion but as a program designed to reward the individual for his thrift. While it is true that thrift seemingly is no longer the virtue that it once was and that profligacy, once considered a vice, has largely replaced it, it is well to remember that it was the virtue of thrift that to a great extent accounted for our substantial economic growth as a developing nation throughout the years.

I cannot agree that the defendant is the scofflaw that plaintiffs would have us believe. It seems more consonant with equity and good conscience to hold that defendant's Eagle Stamp policy was not invalid as found by the trial court in its ruling here appealed from, but was in fact a legitimate exercise of retailing merchandise.

We observe as a persuasive factor of great significance that no court, legislature or congress has ever found that trading stamps are, or should be, considered "finance charges" or "time charges." This goes to the very basis of the opinion in this case, for if there is no such finance charges made by the defendant then there could be no common question of law or fact upon which to base class action. *Nebel v. City of Chicago*, 53 Ill. App. 3d 890.

It has been previously pointed out that the plaintiffs rely somewhat heavily upon the fact that some of the language of the Illinois act is taken from the Federal Truth in Lending Act.

In this respect it is also noteworthy that the Federal Truth in Lending Act now provides that in determining the amount of any award the court shall take into consideration "the extent to which the creditor's failure of compliance was *intentional*". This would seem to also indicate the trend in such cases for it can hardly be said that there was evidence to indicate a violation of the law, let alone an intentional one. (15 U.S.C. §1640a (1976)).

Furthermore, section 1666 F2(b) of the same Federal act now provides that "any discount not in excess of 5 per centum offered by the seller for the purpose of inducing payment by cash, check or other means not involving the use of a credit card, shall not constitute a finance charge as determined under 1605 of this title, if such discount is offered to all prospective buyers and its availability" is adequately disclosed. Here the evidence indicated at the most a bonus of 1.8% involved.

We also note that section 1666j(c) of the Act (as amended February 27, 1976) provides that any such discount for paying cash "shall not be considered a finance charge or other charge for credit under the usury laws of any state or under the laws of any state relating to disclosure of information in connection with credit transactions, or relating to the

types, amounts or rates of charges, or to any element or elements of charges permissible under such laws in connection with the extension or use of credit."

We detect one other fatal flow in the trial court's opinion which was adopted by the majority. Under the State-Federal system of our jurisprudence jurisdiction of certain cases is pre-empted by the Federal courts. State courts are likewise limited to jurisdiction over problems generally speaking involving transactions occurring in their respective States or transitory actions brought where the defendant resides. This particular question is of importance in this case because here we have what is fundamentally a Missouri case—involving a Missouri-based retailer—concerning largely Missouri residents and Missouri transactions. Missouri law of a rather technical nature largely governs the transactions involved, yet we have an order entered by an Illinois court which boldly assumes the burden of interpreting Missouri statutes and construing contracts which are to be performed and completed by payment in Missouri. This in itself should make any chancellor hesitant about exercising equitable jurisdiction of the nature involved here, and ordering such broad remedies especially when the representatives of the class are two Illinois citizens and there are no citizens of Missouri who are plaintiffs. *Brooks v. Midas-International Corp.*, 47 Ill. App. 3d 266, 361 N.E.2d 815, recognizes the problem and permitted only Illinois transactions to be included in the class action. The majority opinion relys upon *Kimbrough v. Parker*, 344 Ill. App. 483, 101 N.E.2d 617. This case did involve residents of more than the one State of Illinois—but the question of multistate jurisdiction was not raised there, nor was it ever discussed.

We submit that the fact that there may have been a more or less cohesive class of persons involved here does not provide an answer to the problem of what in fact amounts to an attempted usurpation of another State's right to determine its own laws through its own courts and to enforce its laws at the behest of its own attorney general.

We have previously noted our agreement with the majority opinion to the effect that both the Missouri and Illinois acts are credit disclosure laws. Their principal purpose is to assure a meaningful disclosure of credit terms so that the consumer may compare more readily the various credit terms available to him and thus avoid the uninformed use of credit.

If this then be the agreed purpose of the both acts, we fail to see how the trial court and the majority of this court could find this purpose was not complied with by the manner in which the Eagle-stamp bonus was brought to the attention of the defendant's customers. It seems to us to be stated in the most simple and understandable terms the alternative available to the customer of paying within the 30-day time period. We know of no requirement in law that this time-honored inducement for

prompt payment be included in plainer or more bold type than what is shown by the reverse side of Exhibit "C".

Because it would unduly lengthen this opinion and because the court's opinion and the briefs and arguments of the parties present an adequate analysis thereof, we have purposely refrained from discussing the factual details of the various Illinois class action cases. Also, to do so would run contra to the principle of law which we enunciated earlier—each class action case must stand upon its own facts and rest largely within the discretion of the trial judge. I think that the discretion in this case was unjustly applied.

I would vacate the summary judgment in this case and grant defendant's motion to dismiss this action as a class action for the reasons above stated.