R. HERBERT ROSS, Individually and as Representative of a Class, Plaintiff-Appellant, Cross-Appellee, *v.* THE CITY OF GENEVA, Defendant-Appellee, Cross-Appellant.

Second District (2nd Division)   No. 75-280

Opinion filed November 30, 1976.

T. M. Reuland, Charles F. Thompson, Jr., and William C. Murphy, all of Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellant.

Bruce R. Johnson, of Wheaton, and Ancel, Glink, Diamond & Murphy, of Chicago, for appellee.

Mr. PRESIDING JUSTICE THOMAS J. MORAN delivered the opinion of the court:

From 1960 to June 1973, there was in effect in the City of Geneva an ordinance under which the plaintiff and other commercial users of electricity (produced by Geneva in its capacity as a public utility) were charged an additional fee of 10% above the price of the kilowatt hours of electricity used. The money thus collected was designated by ordinance as a special parking fund and was earmarked to finance meter-free parking areas for the downtown business area of the City of Geneva. On

June 22, 1973, for the first time since the defendant instituted the above 10% charge, it was specifically segregated on commercial user's bills and noted as a "misc." charge thereon. Upon receiving his June 22 billing, plaintiff Ross made immediate inquiry and objections regarding the parking surcharge, henceforth paid the surcharge portion separately with a check indicating payment was made under protest, and filed this action within the month against the City of Geneva in its capacity as a public utility. By his action plaintiff sought, on behalf of himself and the 1100 other past and present commercial customers similarly situated, a judgment declaring the 10% surcharge to be void and sought restitution to the class of all amounts so collected (approximately $353,000) since 1960 pursuant thereto. Notice of the pendancy of this suit, purporting to be a class suit and advising the class members of the possibility they would be bound by the results (although subject to no personal liability on account thereof) was given by individual mailings to the 1100 class members and by repeated publication prior to trial.

The trial court invalidated the ordinances involved and enjoined their future enforcement on the basis that they were without statutory authority. The court did not reach the constitutional issue that the ordinance was invalid as discriminatory. Judgment was entered for the named plaintiff in the amount paid by him (about $1100). The court, however, denied the class action on the basis that there was insufficient commonality of interest between the named plaintiff and the class he sought to represent and under *Hansberry v. Lee* (1940), 311 U.S. 32, 85 L. Ed. 22, 61 S. Ct. 115, held the class members would be denied due process.

Plaintiff appeals the denial of the class action and asks that reasonable attorneys' fees be awarded his attorneys. Defendant cross-appeals the order voiding its parking surcharge ordinances.

We first consider the issue raised by the cross-appellee—the validity of the parking surcharge ordinances. Defendant argues that under the Illinois Municipal Code, section 11—117—12 (Ill. Rev. Stat. 1973, ch. 24, par. 11—117—12), and previously under section 49—12 of the Revised Cities and Villages Act (Ill. Rev. Stat. 1959, ch. 24, par. 49—12), the city is authorized to fix charges for the products supplied "sufficient at least" to bear all cost of maintenance and operation; that this statutory language authorizes the municipal utility to operate at a profit; that profits may be used to defray general costs of government; that the establishment and maintenance of parking facilities is a proper corporate purpose; therefore there was statutory authority for the collection of the parking fund surcharge. This entire line of reasoning fails because, on examination of the subject parking fund ordinances, we find that monies derived therefrom do not have the essential characteristics of profit for they

accrue whether or not expenses for operating and maintaining the utility have been first met. Instead, under the ordinance, the surcharge herein accrues and is set aside for parking even if the utility operates "in the red."[1] We therefore find the authorities cited for the proposition that a municipal utility may operate at a profit wholly inapposite to the issue at hand. This is not a case of the city government appropriating funds from utility profits for general corporate purposes. It is rather a case of a city utilizing its municipally owned electric utility to exact a fee from a limited class of customers for the isolated unrelated purpose of establishing municipal parking facilities.

■■ The utility is used here not merely, as suggested by defendant, as a convenient point of contact for billing purposes between the City and the commercial users who are said to derive most directly the benefits of the parking program. Rather, the charge made of each commercial user is, with minor variations in the formula, directly linked to the amount of electricity used by the commercial customer. The narrow question presented by this case is, therefore, whether a municipally owned utility has the authority to charge its commercial electric customers a fee, based on their electrical consumption, to be used solely for city parking facilities. This court has stated, "It is horn-book law that Illinois municipalities are creatures of the legislature and therefore have only delegated powers." (*Norwick v. Village of Winfield* (1967), 81 Ill. App. 2d 197, 199, *appeal denied*, 36 Ill. 2d 631 (1967).) Statutes granting power to a municipal corporation are construed strictly against the municipality which claims the right to exercise the power. (*City of Chicago Heights v. Western Union Telegraph Co.* (1950), 406 Ill. 428, 432-33.) In the *Norwick* case, this court held the municipality acted without statutory authority when it attempted to charge a "sewer property charge" and "treatment plant charge" in addition to the fee for sewer installation. These additional charges were held to be invalidly imposed because they were not made for sewer connections or use, but for future sewer improvements and extensions. The court noted that "the charge in question is not for actual use of the sewer or for even a proposed use. It is rather a charge for construction of a sewer system at some future time to serve someone else. * * * Charges not relating to the actual use * * * are therefore invalid." (*Winfield,* at 201-203.) In *Winfield* the applicable statutory grants of power read:

> "A municipality owning, acquiring, or constructing and providing for the operation of a combined water works and sewerage system may improve and extend that system, and may impose and collect charges or rates for the use of that system * * *." (Section 11—

---

[1] The utility has in fact during each year in question operated at a profit of between $150,000 and $500,000 without regard to the surcharge monies.

139—2, Illinois Municipal Code, Ill. Rev. Stat. 1965, ch. 24, par. 11—139—2.)

"The * * * municipality * * * may * * * charge the inhabitants thereof a reasonable compensation for the *use and service* of the combined water works and sewerage system and to [*sic*] establish rates for that purpose *. * *. These *rates * * * shall be sufficient* at all times to (1) *pay the cost of operation and maintenance* of the combined water works and sewerage system, (2) provide an adequate *depreciation fund,* and (3) pay the *principal* of *and interest* upon all revenue bonds issued under this Division." (Section 11—139—8, Illinois Municipal Code, Ill. Rev. Stat. 1965, ch. 24, par. 11—139—8.) (Emphasis added.)

The special sewerage fees charged in the *Winfield* case were held by the trial and appellate courts to be "isolated" funds for building of a future sewerage system, unrelated to the use and service of the existing sewer system, and therefore without statutory authorization.

The relevant statutes in the case at bar, and their predecessor under whose authority the ordinances in question were allegedly passed, provided that a municipality has the power to acquire, construct, own and operate a public utility. (Section 49—1 of the Revised Cities and Villages Act, Ill. Rev. Stat. 1959, ch. 24, par. 49—1; Illinois Municipal Code, section 11—117—1, Ill. Rev. Stat. 1973, ch. 24, par. 11—117—1.) "Public utility" is defined to mean property used in connection with transportation, telephone or telegraph, services in furnishing cold, heat, light, power, water; or conveying oil or gas or acting as a wharfinger. Section 49—2 of the Revised Cities and Villages Act, Ill. Rev. Stat. 1959, ch. 24, par. 49—2; section 11—117—2 of the Illinois Municipal Code, Ill. Rev. Stat. 1973, ch. 24, par. 11—117—2.

The charging for services was formerly governed by section 49—12 of the Revised Cities and Villages Act (Ill. Rev. Stat. 1959, ch. 24, par. 49—12) which has been succeeded by section 11—117—2 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, par. 11—117—12). Both sections contain the following language:

"The *charges fixed for the product supplied or the service rendered* by any municipality *shall be sufficient at least* to bear all costs of *maintenance* and *operation,* to meet *interest charges* on the bonds and certificates issued on account thereof, and to permit the accumulation of a surplus or *sinking fund* to meet all unpaid bonds or certificates at maturity." (Emphasis added.)

■■ We find no statutory authority whatever therein to charge fees for the creation of an isolated fund unrelated to the cost of the products supplied or the services rendered. The parking fund in this case is just such an unrelated, isolated fund. The trial court correctly found the

ordinances purporting to create it void for want of statutory authority.

Plaintiff Ross urges that as all the 1100 commercial customers whom he purports to represent were wrongly charged the illegal 10% surcharge, they should be entitled, as plaintiff was entitled by the trial court, to restitution of a portion of the $353,000 fund collected without legal authority from the class. (It was stipulated at trial that the information necessary to determine these individual amounts is within the defendant's possession.)

Defendant asserts, however, that the plaintiff cannot maintain this action as a class suit because the interests of those whom he purports to represent are in conflict with his own. The reasons cited by defendant are basically these: some of the purported class members are past and present city officials who instituted the very ordinance plaintiff seeks to have overturned in this case; some of the purported class members are past and present merchants to whose benefit the parking program redounded, who like it, who paid the charges voluntarily, who want it continued, who do not wish to have a refund of the monies collected, and who do not wish to be represented by Ross in this suit; some of the purported class members are taxpayers to the City of Geneva (unlike Ross who moved from the City), upon whom the eventual burden of paying any judgment in this case would fall. These groups, of course, to some extent overlap. At trial, over the strenuous objections of the plaintiff, defendant introduced the affidavits and testimony of approximately 50 purported class members whose interest in one or more of the above ways was demonstrated to conflict with Ross's interests. Defendant argues and the trial court agreed that, because of these conflicts, Ross's action "lacks the commonality of interest requisite to maintenance of class actions."

Prerequisites for a class action in Illinois have been stated to be "the existence of common questions which dominate the controversy and pertain to each class member and an interest in a common result." *Adams v. Jewel Companies, Inc.* (1976), 63 Ill. 2d 336, 347, and cases cited therein.

■■ Relevant factors to be considered in deciding if the required commonality exists are:

" * * * whether the claims of all members of the class share a common question of law and fact, such as the existence ·of a common fund from which relief can be given [citations]; whether the causes of action of the members of the class arise from the same transaction [citations]; whether one party can adequately represent the rights and interests of all other members of the purported class [citations]; whether the number of possible class members renders separate litigation impossible or impractical [citations]; and whether there exists a purely equitable cause of

action [citations]." *Moseid v. McDonough* (1968), 103 Ill. App. 2d 23, 27-28.

Where there exists a common, dominant and pervasive issue, the propriety of a class action is not defeated by the existence of subsidiary individual issues (*Rosen v. Village of Downers Grove* (1960), 19 Ill. 2d 448, 456; see *Perlman v. First National Bank* (1973), 15 Ill. App. 3d 784, 803, *appeal dismissed for want of concurrence of four justices,* 60 Ill. 2d 529 (1975)), and "where it appears the common issue is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action." *Harrison Sheet Steel Co. v. Lyons* (1959), 15 Ill. 2d 532, 538; see also *Gowday v. Commonwealth Edison Co.* (1976), 37 Ill. App. 3d 140, 151 n. 7.

In the case at bar, the dominant and pervasive issue pertaining to all class members is clearly the legality of the parking surcharge collected by defendant. Each class member has a legal interest in the restitution of any amounts which defendant, without statutory authority, required him to pay into the fund. Clearly subsidiary is the consideration of the other issues (voluntariness of payment, or other waiver of right to refund which would bar the recovery by individual class members). As was stated in *Rosen,* at page 456, "[T]he defendants' opportunity to establish the circumstances and to assert their legal defenses will not be impaired by litigating any such subsidiary issues in the present action instead of in separate actions."

The asserted conflict of interest between the named plaintiff and the members of the class he purports to represent is an issue which, with reference to the great majority of the members of the class, we find to be highly speculative. Although defendant has produced some 50 persons who, in one fashion or another, have indicated that they do not support this suit, the defection of a relative few does not destroy a class of 1100. Moreover, it would be wholly unwarranted for this court, as suggested by defendant, to presume that the silent balance of some 1050 commercial electric users chose to shoulder the burden of providing the city's merchants with public parking facilities when it is clear, from the testimony of defendant's own expert witness, that alternate sources and methods of funding parking lots were available to the city. We cannot presume that these 1050 members do not wish restitution of unlawful fees collected from them. Contrary presumptions are more likely, in view of the fact that only 50 of the 1100 members of the class "defected," although they were given personal notice of the suit and, in some cases, were contacted directly by defense counsel.

Likewise falls defendant's contention that the named plaintiff is in a conflict of interest situation, rendering him an improper class representative, because he is no longer a Geneva taxpayer, unlike other

class members who will assertedly bear the burden of any judgment herein in the form of higher taxes. The basis of defendant's argument is a stipulation in the record to the effect that payment of any judgment herein will not be restricted to the parking fund or the general funds of the electric utility, but may be recovered from the general corporate funds of the City of Geneva. Defendant's theory appears to be that the taxpaying members of the plaintiff class will be required to support a judgment herein in the form of higher taxes, either directly as a result of a judgment payable out of general corporate funds, or indirectly, as a result of payment out of electric utility profits which normally supplement the general fund by $150,000 to $500,000 per year.[2] It is not asserted that the net benefit to the 1100 class members from restitution of the funds could be outweighed by an increase in taxes. That the class representative benefits proportionately more than other class members does not, *ipso facto,* create a conflict of interest. We cannot presume the presence of a conflict in absence of evidentiary support.

Furthermore, taken to its logical ends, defendant's theory could bar virtually all taxpayer class actions against municipal entities in which larger taxpayers were class members. The large taxpayer could always claim conflict to bar the class action of a class representative who pays less taxes in that any judgment with the potential tax consequences would fall more heavily on the former than the latter.

Defendant cites, and the trial court found convincing, *Hansberry v. Lee* (1940), 311 U.S. 32, 85 L. Ed. 22, 61 S. Ct. 115, as authority for holding Ross inadequate to represent the interest of the purported class because of interests in conflict with certain class members. The trial court was persuaded that one seeking to invalidate the special parking fees could not adequately represent the interest of those supporting it. *Hansberry* held that due process of law requires adequate representation of class members, and held due process required that the adverse findings in a prior adjudication—*Burke v. Kleiman* (1934), 277 Ill. App. 519—were not *res judicata* as to plaintiffs whose interests were inadequately represented by parties antagonistic to plaintiffs in that litigation. (It should be noted that the *Burke* adjudication was deemed to be a class action in the subsequent case of *Lee v. Hansberry* (1939), 372 Ill. 369.) The United States Supreme Court, in *Hansberry v. Lee,* found that due process consisting of notice and hearing was lacking in the *Burke* case and, consequently, *res judicata* was not applicable. Also, the very fact assserted to be *res judicata* from the prior case had been wrongfully stipulated to in the earlier proceeding by the supposed class

---

[2] The effect of such a stipulation was not raised as an issue here, and although we question the validity of such stipulation, we need not decide the same.

representative. The Supreme Court in *Hansberry* held that due process requires adequate representation of class members, and such had not been provided the plaintiffs whose interests were antagonistic to those of the class representative. The court held the plaintiffs not bound by the adverse finding in the prior litigation, and held that no class existed.

While we do not question the correctness of *Hansberry v. Lee,* we do believe it does not govern the case at bar. Unlike the proceedings out of which *Hansberry* arose, this action was handled as a class action. Unlike *Hansberry,* repeated notices of the nature and pendency of the suit were published, and individual notice was mailed to all class members informing them of the suit and the possibility of its affecting their rights, and inviting them to "take such steps, if any, as you wish in relation to this lawsuit." Moreover, although Illinois law contains no formal procedure whereby potential members of a plaintiff class may opt out of that class if they deem themselves inadequately represented [3], such right to opt out is inherent in Illinois law. As the asserted conflict of interest between plaintiff and the vast majority of the class is highly speculative, and as individual notice was given indicating the individual members might wish to take steps in relation to the suit, we believe the due process considerations uppermost in *Hansberry* have been satisfied in this case.

■■ Defendant asserts that, even if the class action is otherwise proper, voluntary payment of the parking surcharge held invalid bars Ross's individual recovery and destroys the basis for any class suit. Defendant contends the payer of a fee under a void ordinance waives the right to recovery unless he protests in some manner, or the facts of the transaction itself establish that the payment was involuntary. Defendant cites *Fisher v. City of Ottawa* (1972), 8 Ill. App. 3d 553. The *Fisher* case is inapposite because, there, fees voluntarily paid were late payment penalties which, the court held, were within the power of the plaintiffs to have avoided. The charges in the instant case could not have been avoided by the voluntary action of Ross or other class members. However, assuming *arguendo* that defendant has correctly stated the law, the mere payment, without protest, of the parking surcharge herein does not constitute waiver of a right to recovery. It is clear that when a business person pursues his only commercially reasonable course of action, although the action in some limited sense involves choice, such action does not rise to the level of waiver or estoppel. In the case of *Chicago & Eastern Illinois Ry. Co. v. Miller* (1923), 309 Ill. 257, 260, it was stated that "where money is paid under pressure of severe statutory penalties or disastrous effect to business, it is held that the payment is involuntary and that the money may be recovered * * *. Conduct under duress always involves a choice, but this court has held that the making of a choice under

---

[3] See Rule 23(c) Fed. R. Civ. P.

such circumstances does not estop the person acting under duress from later asserting his rights." See also *People ex rel. Carpentier v. Treloar Trucking Co.* (1958), 13 Ill. 2d 596.

■■   In the case at hand, defendant was the sole provider of electricity to the class members' commercial enterprises. There was evidence that it was defendant's policy to terminate, and it has terminated, the supply of electricity to users for nonpayment of imposed charges. Furthermore, unlike tax cases where there is a statutory protest mechanism, none exists here. We believe that the payment of the parking surcharge was the commercially reasonable action under the circumstances, and does not, without more, constitute a waiver of the right to recovery nor destroy the class.

■■   It is asserted that the relationship between defendant and plaintiff was based in contract, and that the statute of limitations bars the right of the class to recover from claims arising more than 5 years after the filing of Ross's complaint. This complaint was filed seeking equitable relief— the imposition of a constructive trust on, and the restitution of, funds collected without statutory authority over a period of 13 years. Equity requires the return of money rightfully belonging to another (*Highway Commissioners v. Bloomington* (1912), 253 Ill. 164, 174), and "[t]his court will not sanction the nullification of equitable doctrines by close conceptual reasoning * * *." (*Board of Trustees v. Village of Glen Ellyn* (1949), 337 Ill. App. 183, 198; see also *County of Lake v. X-Po Security Police Service* (1975), 27 Ill. App. 3d 750, 775.) To do equity in this case requires the restitution of all parking surcharge monies collected over the 13 years under the subject ordinances.

The plaintiff vigorously urged the trial court, and now urges us, to exclude evidence obtained as the result of defendant's alleged repeated violations of Disciplinary Rule 7—104 of the ABA Code of Professional Responsibility. Rule 7—104 states that during the course of his representation with a party he knows to be represented by a lawyer in that matter, and he shall not give advice to a person who is not represented by a lawyer other than advice to secure counsel, if the interest of that person has a reasonable possibility of being in conflict with the interest of his client. The evidence urged as improperly obtained includes the affidavits and testimony of the 50 some class members who indicated that they did not support this suit. While we, like plaintiff, are concerned with the practice of contacting members of the opposing class, which presents the opportunity to misrepresent the nature and effect of the class action and to encourage defection[4], we have found no Illinois rule or case law which would allow us to exclude such evidence. We therefore decline to exclude this evidence.

---

[4] See I J. Moore, Federal Practice, pt. 1, §1.41.

■■ We affirm that portion of the trial court order declaring the subject ordinance void for want of statutory authority, and enjoining future collections thereunder. We reverse that portion dismissing the class action. This cause is remanded to the trial court for further proceedings consistent with the view expressed herein.

Affirmed in part, reversed in part and remanded.

RECHENMACHER and DIXON, JJ., concur.