In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2915

FRANK P. RANDAZZO, as Trustee for
Frank P. Randazzo Declaration of Trust
Dated July 18, 1997,

Plaintiff-Appellant,

v.

HARRIS BANK PALATINE, N.A.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 6161--Ruben Castillo, Judge.

ARGUED JANUARY 25, 2001--DECIDED August 21, 2001


   Before COFFEY, RIPPLE and DIANE P. WOOD,
Circuit Judges.

   RIPPLE, Circuit Judge.  Frank Randazzo,
as trustee under a declaration of trust
("FPR Trust"), entered into three
agreements with Harris Bank Palatine
("Harris") in April 1999 to establish a
$2.8 million revolving credit line. In
September 1999, Mr. Randazzo filed suit
against Harris, alleging breach of
contract and violations of the Illinois
Consumer Fraud and Deceptive Business
Practices Act, 815 ILCS sec. 505/1 et
seq. Harris moved for summary judgment,
and the district court granted the
motion. For the reasons set forth in the
following opinion, we affirm the judgment
of the district court.

I

BACKGROUND

A.  Facts

   Mr. Randazzo, a long-standing customer
of Harris, entered into three agreements
with the bank in April 1999 that
established a $2.8 million revolving
credit line for the FPR Trust. The line
was secured by Mr. Randazzo's stock in
America Online ("AOL"), Cisco Systems,

and Sun Microsystems. Harris required Mr. Randazzo to sign blank stock powers for those securities, giving Harris the authority to sell them.

Mr. Randazzo did not read any of the loan documents that established the credit line. In fact, he indicated in his deposition that in the past twenty-five years he had not read any of the paperwork accompanying his various loans. See R.15, Def.'s Ex.2, Randazzo Dep. at 66 ("I've never read any loan documents or any other documents ever put in front of me by a bank."); see id. at 172 ("Why would I read them then if I hadn't read them for the previous 25 years?"). Mr. Randazzo explained that John Callahan, the Harris loan officer servicing the credit line, explained the key economic terms of the credit line to him.

Between April 7, 1999, and August 5, 1999, Mr. Randazzo and Callahan never spoke concerning the Harris loan or its underlying collateral. On August 6, 1999, however, Callahan reviewed the credit line and, using the bank's loan-to-value ratio, determined that Mr. Randazzo had insufficient collateral to secure the loan because the value of the AOL stock had declined in the previous fifteen months. Callahan thus telephoned Mr. Randazzo and requested that he either reduce the loan balance or provide additional collateral. Callahan told Mr. Randazzo that Harris was making a margin call and that the bank would sell the stock if Mr. Randazzo did not comply. Mr. Randazzo responded that he was willing and able to satisfy the request for more collateral and offered a second lien on his Florida residence. He also requested that Callahan delay any action to permit Mr. Randazzo to supply Harris with an updated financial statement.

On August 10, 1999, after reviewing the updated financial statement that Mr. Randazzo supplied and meeting with Harris Bank President Thomas MacCarthy, Callahan again telephoned Mr. Randazzo. In that conversation, Callahan told Mr. Randazzo that Harris would not accept the additional collateral or the second lien on Mr. Randazzo's home. Callahan also informed him that Harris would sell the existing collateral to pay off the loan if Mr. Randazzo did not reduce the loan balance by $900,000 or provide other,

acceptable collateral.

Mr. Randazzo was upset by Harris' actions. In his deposition, he recounted the ensuing conversation with Callahan as follows:

I said, "John, how in the hell can you sell me out when I've been a customer of your bank for over 25 years, never been late on one payment"--this is when I did get offended--"never late in 25 years, paid you millions of dollars? I have collateral that I'm willing to give you. . . ."

. . .

He [Callahan] just says that, "Frank, you're either going to sell out"--he says, "Let me remind you that we've got the stock; we've got the stock power." I says, "John," I says, "I can't believe you're doing this to me." I kept repeating it because I literally could not believe it.

Id. at 250-51.

Callahan then presented Mr. Randazzo with a choice; he told him that either he had to sell the stock or that the bank would do so. Because Mr. Randazzo remembered that Harris' parent company once had charged him what he considered an exorbitant commission to sell stock, he asked Callahan what Harris would charge him for the sale. Callahan replied that he did not know. Mr. Randazzo then found a broker willing to sell the 23,000 shares for less than $2,000. Mr. Randazzo called Callahan; Callahan told him that he had not obtained commission fee information from any brokers. Mr. Randazzo then elected to sell the stock himself. He later explained that he saw no alternative and wanted, at a minimum, to avoid the inflated commission that he expected Harris would have charged for the sale of his securities. Mr. Randazzo never questioned Harris' purported right to sell the existing collateral and pay off the loan. According to Mr. Randazzo, "I never argue with a banker. . . . [W]hatever bankers want is what I give them all the time." Id. at 218, 135. He explained that, if he had "read the document beforehand, I would have told Mr. Callahan to stick it right up." Id. at 277.

The sale's proceeds were wired to Harris and deposited to close out Mr. Randazzo's credit line. Three days later, on August 15, 1999, Mr. Randazzo faxed Callahan to inform him that the stocks that Mr. Randazzo had sold had increased in value during the three-day period. He claimed that, as a result of the sale, he had lost over $400,000.

## B. District Court Proceedings

Mr. Randazzo filed this diversity action against Harris in September 1999, alleging breach of contract and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS sec. 505/1 et seq. ("Consumer Fraud Act" or "the Act"). In essence, Mr. Randazzo alleged that Harris forced him to sell the stock although it had no right to do so because he was not in default under his agreement with the bank. Harris moved for summary judgment, and the district court granted the motion.

In the district court's view, the voluntary payment doctrine was dispositive of Mr. Randazzo's claims. Under this doctrine, a plaintiff who voluntarily pays money in reply to an incorrect or illegal claim of right cannot recover that payment unless he can show fraud, coercion, or mistake of fact. See Smith v. Prime Cable of Chicago, 658 N.E.2d 1325, 1329-30 (Ill. App. Ct. 1995); Jursich v. Arlington Heights Fed. Sav. & Loan Ass'n, 441 N.E.2d 864, 866 (Ill. App. Ct. 1982). The district court determined that this doctrine applied here: Harris claimed that the loan agreement gave it the right to sell Mr. Randazzo's stock held as collateral, and, because of that representation, Mr. Randazzo paid the bank.

The district court refused to permit Mr. Randazzo to escape the strictures of the voluntary payment doctrine by claiming fraud or mistake of fact. Although these factors can provide protection from the application of the doctrine, neither is available when a party to a contract relies on the interpretation of another party as to the meaning of the terms of the contract. "This is true," the district court explained, "because a party who has access to a written

instrument cannot reasonably rely on representations of other contracting parties respecting the effect of the written instrument." R.23 at 4. Consequently, the court held, Mr. Randazzo cannot assert fraud or mistake of fact because he chose to rely on Harris' representations regarding thecontract rather than reading the loan documents himself.

The district court also recognized that coercion can render the voluntary payment doctrine inoperative. Under Illinois law, a payment is considered coerced when it is made to avoid the loss of a necessity or to prevent an injury to a person, business, or property that is different from and disproportionately greater than the unlawful demand. In the district court's view, there was no coercion because the sale of Mr. Randazzo's stock did not involve the loss of a necessity. Moreover, Mr. Randazzo did not produce any evidence that the loss that he claimed he suffered from his sale of the stock was legally different from or disproportionately greater than what the loss would have been under Harris' allegedly unlawful demand.

In the end, the district court held that this case was controlled by the fundamental principle that a mistake of law does not excuse a voluntary payment. Mr. Randazzo did not read the loan documents and instead relied on Harris' statement that it had a legal right under the contract to sell the collateral. This mistake of law, the court concluded, prevented Mr. Randazzo from recovering the monies paid.

The court also held that Mr. Randazzo failed to state a claim under the Illinois Consumer Fraud Act for two reasons. First, Harris did not make a misrepresentation of fact, as is required under the Act. Also, Mr. Randazzo failed to produce evidence of a deceptive practice, another requirement.

II

DISCUSSION

A. Voluntary Payment Doctrine

1.

Illinois has recognized the ancient,

common-law roots of the voluntary payment doctrine. Accordingly, we begin our analysis by recalling briefly the origins and development of that doctrine.

Although the principle that "ignorance of the law is no excuse" has been unquestioned in Anglo-American criminal jurisprudence, the development of an analogous principle in civil matters always has been subject to more limitations because of the development of equitable principles in chancery practice. See generally Stephen L. Camp, Note, The Voluntary-Payment Doctrine in Georgia, 16 Ga. L. Rev. 893 (1982). Indeed, English law at one time recognized in its chancery courts the general rule that relief would be granted for both mistakes of fact or law. See id. at 895 (citing various cases in which the English courts granted relief for mistakes without distinguishing between mistakes of fact and mistakes of law). In the early nineteenth century, however, the English courts and, soon thereafter, American tribunals began to acknowledge that recovery ought not be premised on a mistake of law made with full knowledge of the facts. See id. at 895-98. The voluntary payment doctrine is a corollary to the mistake of law doctrine and, in its general formulation, holds that a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution. See id. at 899; see also Restatement (3rd) of Restitution and Unjust Enrichment sec. 6 (2000). Its ties to the mistake of law doctrine have remained clear, as demonstrated by the fact that most jurisdictions that have rejected the mistake of law doctrine also have rejected the voluntary payment doctrine. See Camp, supra, at 899. Nevertheless, equitable principles of restitution have continued to exert a strong influence on the application of the doctrine. Consequently, most courts, and, when statutory formulations have been utilized, legislatures have made exceptions to the voluntary payment doctrine to recognize the policy concerns that animate the basic restitutionary principle that "[a] person who is unjustly enriched at the expense of another is liable in restitution to the other." Restatement (3rd) of Restitution and Unjust Enrichment sec. 1; see also Camp, supra, at 907-13.

2.

   The voluntary payment doctrine in Illinois reflects the common-law history of the doctrine, including its roots in the mistake of law doctrine and the countervailing restitutionary principles. Not too long ago, an Illinois appellate court succinctly stated the general rule: "Absent fraud, coercion or mistake of fact, monies paid under a claim of right to payment but under a mistake of law are not recoverable." Smith, 658 N.E.2d at 1330.

   The reason for the rule, the court explained, is:

quite obvious when applied to a case of payment on a mere demand of money unaccompanied with any power or authority to enforce such demand, except by a suit at law. In such case, if the party would resist an unjust demand, he must do so at the threshold. The parties treat . . . each other on equal terms, and if litigation is intended by the one of whom the money is demanded, it should precede payment. When the person making the payment can only be reached by a proceeding at law, he is bound to make his defense in the first instance, and he cannot postpone the litigation by paying the demand in silence or under a reservation of right to litigate the claim, and afterward sue to recover the amount paid.

Id. (quoting 66 Am. Jur. 2d Restitution & Implied Contracts sec. 94, at 1035-36 (1973)).

   Two considerations are clear from the Illinois court's discussion. First, the voluntary payment doctrine retains its affinity to the mistake of law doctrine. Second, the voluntary payment rule ensures that those who desire to assert a legal right do so at the first possible opportunity; this way, all interested parties are aware of that position and have the opportunity to tailor their own conduct accordingly.

   Illinois recognizes the traditional defenses to the voluntary payment doctrine--fraud and mistake of fact-- defenses designed to identify instances in which the countervailing policies of traditional restitutionary principles

should prevail. See, e.g., Smith, 658 N.E.2d at 1329-30; Jursich, 441 N.E.2d at 866. Illinois also has recognized the defense of coercion and, like many jurisdictions, has expanded this defense to cover not only cases of actual physical duress but also of business necessity. See Ill. Merchants' Trust Co. v. Harvey, 167 N.E. 69, 71 (Ill. 1929), overruled in part, Kanter & Eisenberg v. Madison Assocs., 508 N.E.2d 1053, 1055-56 (Ill. 1987). The Illinois Supreme Court explained in Illinois Merchants' Trust that:

At the common law duress meant duress only of person, and nothing short of a reasonable apprehension of imminent danger to life, limb, or liberty sufficed as a basis for an action to recover money paid. The doctrine became gradually extended, however, to recognize duress of property as a sort of moral duress, which, equally with duress of person, entitled one to recover money paid under its influence. Today the ancient doctrine of duress of person (later of goods) has been relaxed, and extended so as to admit of compulsion of business and circumstances.

167 N.E. at 71./1

3.

   The district court correctly set out the controlling principle of law as found in the decisions of the Illinois courts. It further recognized the exceptions to the prevailing rules-- exceptions designed, as we have noted, to foster the restitutionary principles that have long stood in tension with the voluntary payment rule. The district court properly acknowledged that Mr. Randazzo could not make out a case for fraud or mistake of fact. To the extent that Mr. Randazzo was ignorant of his rights under the loan agreement, it was because he refused to apprise himself of those rights by reading the appropriate documents. Illinois courts have made clear that, if a party signs a contract without reading it, he must bear the consequences. See Jursich, 441 N.E.2d at 868; see also Pace Communications, Inc. v. Moonlight Design, Inc., 31 F.3d 587, 592 (7th Cir. 1994); Northwestern Nat'l Ins. Co. v. Donovan, 916 F.2d 372, 378 (7th Cir. 1990).

Mr. Randazzo cannot, moreover, make out a case that his compliance with Harris' demand was based on necessity or was intended to prevent an injury to person or property. Indeed, even if we were to conclude that Mr. Randazzo acted to prevent an injury, we point out again that he found himself in that position simply because he had elected not to become knowledgeable about the nature of his legal rights and, correspondingly, had failed to assert them. His own testimony makes clear that he never apprised himself of his legal rights under the contract and never asserted those rights.

Although Illinois recognizes protest as particularly good evidence of duress, see Smith, 658 N.E.2d at 1331; Arra v. First State Bank & Trust Co., 621 N.E.2d 128, 131 (Ill. App. Ct. 1993), Mr. Randazzo's "protest" was not the assertion of a legal right but simply an appeal to Harris' business judgment. Instead of protesting the stock sale as contrary to a specific provision in the loan documents, Mr. Randazzo merely complained, asking Callahan, for example, "how . . . can you sell me out when I've been a customer of your bank for over 25 years." R.15, Def.'s Ex.2, Randazzo Dep. at 250. Faced with a demand for a payment by a party with whom he had a contractual arrangement, Mr. Randazzo, rather than assert his rights under the contract in a timely and forthright manner, chose to accept the other party's interpretation of his legal rights. Indeed, this behavior is precisely the sort of conduct that the voluntary payment doctrine was designed to discourage.

Under these circumstances, the district court correctly decided that the voluntary payment doctrine was applicable. Mr. Randazzo, therefore, cannot recoup his payment to Harris./2

B.  Consumer Fraud Act

Mr. Randazzo also alleges that Harris violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS sec. 505/1 et seq., when it asserted a nonexistent legal right to sell his collateral. The district court found that Mr. Randazzo had failed to state a claim cognizable under the Act because Harris' alleged misrepresentations were of law,

not of fact. Mr. Randazzo contends on appeal that an assertion of legal rights in violation of a contract is actionable. We cannot accept this view.

To state a cause of action under the Consumer Fraud Act, a plaintiff must plead (1) the misrepresentation or concealment of a material fact; (2) an intent by the defendant that the plaintiff rely on that misrepresentation or concealment; and (3) that the deception occurred in the course of conduct involving trade or commerce. See Notaro Homes, Inc. v. Chicago Title Ins. Co., 722 N.E.2d 208, 217 (Ill. App. Ct. 1999). As the prima facie case indicates, the Act requires a misrepresentation of fact. See 815 ILCS sec. 505/2 (prohibiting the "use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment,suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact"); see also Mack v. Plaza Dewitt Ltd. P'ship, 484 N.E.2d 900, 906 (Ill. App. Ct. 1985) (explaining that the Act requires a misrepresentation of a material fact).

The district court was correct in finding that Mr. Randazzo did not state a cognizable claim. Harris' alleged misrepresentations were not of facts, thus removing them from the Act's ambit. Taking a position on the interpretation of legal documents, even if erroneous, is not a deceptive trade practice or act. See Notaro Homes, 722 N.E.2d at 217 ("[A] deceptive representation or omission of law does not constitute a violation of the Act because both parties are presumed to be equally capable of knowing and interpreting the law.")./3

Conclusion

The voluntary payment doctrine precludes Mr. Randazzo from recouping his payment to Harris. Further, he has not stated a cognizable claim under the Consumer Fraud Act. Accordingly, we affirm the judgment of the district court.

AFFIRMED

FOOTNOTES

/1 Although the issue of duress is generally one of fact, to be judged in light of all the circumstances surrounding a given transaction, see Schlossberg v. E.L. Trendel & Assocs., Inc., 380 N.E.2d 950, 953 (Ill. App. Ct. 1978), Illinois courts have pinpointed several circumstances in which duress is commonly found. For example, the payment of money under pressure of a "disastrous effect to business" is considered involuntary. Ross v. City of Geneva, 357 N.E.2d 829, 836 (Ill. App. Ct. 1976) (citation and quotation marks omitted); see also Best Buy Co. v. The Harlem-Irving Cos., 51 F. Supp.2d 889, 898 (N.D. Ill. 1999) (company's payment of disputed rent charges sufficient evidence of duress to withstand summary judgment where landlord threatened to pursue all remedies under the lease, including eviction, if the payments were not made); Kanter & Eisenberg v. Madison Assocs., 508 N.E.2d 1053, 1056-57 (Ill. 1987) (payment of disputed rent made under duress where nonpayment would result in the "termination of a valuable leasehold on which [the plaintiffs] had apparently spent a million dollars in improvements"); Ill. Glass Co. v. Chicago Tel. Co., 85 N.E. 200, 201-02 (Ill. 1908) (although not finding duress, noting that the "telephone has become an instrument of such necessity in business houses that a denial of its advantages would amount to a destruction of the business").

Duress need not, however, reach the level of disaster to preclude application of the voluntary payment doctrine. In Schlossberg, 380 N.E.2d 950, for example, the buyer of a parcel of land had in turn agreed to resell the property to a third party. After tender of the purchase price, the seller demanded an additional $30,000. See id. at 951. Because the buyer was already obligated to sell the property to the third party and would be in default if he could not obtain the deed, the buyer had no choice but to pay the additional funds and then sue for recovery of them. The court determined that the buyer's complaint contained "sufficient factual allegations to warrant an evidentiary hearing on the issue of business duress." Id. at 954; see also Pemberton v. Williams, 1877 WL 9790, at *2, 87 Ill. 15 (Ill. 1877) (duress question for jury when a buyer had paid nearly all the contract price for a parcel of land, had also contracted to resell the property to a third party, and the original seller demanded as a condition of the delivery of the deed a sum larger than was set forth in the contract); Ball v. Vill. of Streamwood, 665 N.E.2d 311, 318 (Ill. App. Ct. 1996) (duress excused plaintiffs' payment of a tax where their homes were subject to contracts to sell to third parties, and the village code provided civil penalties and fines for failure to pay the tax);

DeBruyn v. Elrod, 418 N.E.2d 413, 417 (Ill. App. Ct. 1981) (duress found when the plaintiffs "were confronted with the choice of payment of the sheriff's fees or his refusal to effect the requested sale, execution or redemption"); Ross, 357 N.E.2d at 836 (duress found where utility the sole provider of electricity to the class members' commercial enterprises; there was evidence that it was the utility's policy to terminate, and it had terminated, the supply of electricity to users for nonpayment of imposed charges); Peterson v. O'Neill, 1930 WL 2964, at *1-*2, 255 Ill. App. 400 (Ill. App. Ct. 1930) (money paid under duress when plaintiff had contracted for the resale of property, the defendant was obligated to furnish the deed, and the defendant demanded that the plaintiff pay for the deed, knowing that the plaintiff had contracted for the sale of the property).

Illinois law also provides for the recoupment of payments made under duress for items deemed to be necessities. Specifically, to determine whether duress motivated the payment of a demanded sum, attention must be given to the nature of the asset involved and the consequences of nonpayment. See Arra v. First State Bank & Trust Co., 621 N.E.2d 128, 132 (Ill. App. Ct. 1993). If the asset is a necessity and the consequences of nonpayment would adversely affect the asset, a case might be made for duress as a motivating factor in payment. See id. at 132 (enough evidence of duress to overturn grant of summary judgment in case involving the plaintiffs' home, "which was certainly a necessity"); see also Geary v. Dominick's Finer Foods, Inc., 544 N.E.2d 344, 348-53 (Ill. 1989) (because tampons and sanitary napkins were necessities that could not be purchased without paying the tax imposed, the plaintiffs sufficiently pled duress); Getto v. City of Chicago, 426 N.E.2d 844, 850 (Ill. 1981) (payment under duress when made to avoid real threat of loss of telephone service; telephone a necessity such that "implicit" and "real threat" that phone service would be terminated amounted to duress); Ross, 357 N.E.2d at 836 (payment under duress where termination of electrical services was threatened, there was evidence that it was the defendant's policy to terminate services for nonpayment, and no formal protest mechanism existed that would precede the termination). But see Smith v. Prime Cable of Chicago, 658 N.E.2d 1325, 1332-33 (Ill. App. Ct. 1995) (payment for cable service not under duress; plaintiffs' allegations of threatened loss were "wholly speculative" and cable service not a necessity such that the loss or threatened loss thereof could furnish a motive for payment); Dreyfus v. Ameritech Mobile Communications, Inc., 700 N.E.2d 162, 167 (Ill. App. Ct. 1998) (same

for cellular telephones); Lusinski v. Dominick's Finer Foods, Inc., 483 N.E.2d 587, 591 (Ill. App. Ct. 1985) (plaintiff's inability to use a discount coupon did not rise to the level of duress); Isberian v. Vill. of Gurnee, 452 N.E.2d 10, 14 (Ill. App. Ct. 1983) ("potential disappointment" of the plaintiff's child if prohibited from attending an amusement park insufficient to warrant a finding that the plaintiff purchased the ticket under duress).

/2 Because we are deciding this case under the voluntary payment doctrine, we need not address Harris' remaining defense that Mr. Randazzo breached the loan agreement.

/3 Mr. Randazzo also claims that Harris violated the Consumer Fraud Act by subjecting him to threats and economic coercion. Specifically, he contends that Harris forced him to sell his stock by threatening to sell the stock, and charge higher commissions, if he did not sell it himself. Harris' reliance upon its perception of its legal rights under the contract is insufficient to form the basis of a violation of the Act.